BRETT A. AXELROD, ESQ. (Bar No. 168657)
NICHOLAS A. KOFFROTH, ESQ. (Bar No. 287854)
**FOX ROTHSCHILD LLP**
Constellation Place
10250 Constellation Blvd., Suite 900
Los Angeles, California 90067
Telephone: (310) 598-4150
Facsimile: (310) 556-9828
Email: baxelrod@foxrothschild.com
        nkoffroth@foxrothschild.com
*Proposed Counsel for Debtors*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# NORTHERN DIVISION

| | |
|---|---|
| In re | Case No. 9:21-bk-10412-MB |
| ORCUTT RANCHO, LLC, | Chapter 11 |
| | **FIRST-DAY DECLARATION OF GARY GREENBERG IN SUPPORT OF EMERGENCY FIRST DAY MOTION** |
| Debtor. | |
| | Hearing Date:  April 26, 2021<br>Hearing Time:  10:30 a.m. (Pacific Time)<br>Location:      1415 State Street<br>              Santa Barbara, CA 93101 |

I, Gary Greenberg, being duly sworn, hereby depose and declare under penalty of perjury:

1.    I am the managing member of Apollo Development, LLC, a Colorado limited liability company ("Apollo"). Apollo is the majority member of Orcutt Rancho, LLC ("Orcutt" or "Debtor"), debtor and debtor in possession in the above captioned chapter 11 case (the "Chapter 11 Case"). I submit this declaration in support of the Debtor's chapter 11 petition, the motion for approval of debtor-in-possession financing (the "DIP Motion"), and for any other purpose authorized by law.[1]

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant DIP Motion.

Active\121709495.v2-4/21/21

2.    I have 42 years of domestic and international experience as in asset management, lending, equity, joint ventures, mortgage portfolios, structuring, brokering and loan/equity presentation packaging, both as a principal and through third parties, for transactions and deals that have equaled over ten billion dollars. My experience includes deal origination, negotiation, structuring, documentation and management of high-value domestic and international transactions. I also have expertise in structured and problem loans, credit risk, and regulatory compliance. In these capacities, I have worked on projects related to fine art, oil and gas, commercial real estate of all property types, commercial and residential construction, commercial equipment leasing, securities and corporate finance.

3.    From 1980 to 1992, I held Registered Representative and BlueSky licenses. From 1986 to 1992 I held a General and Financial principal's license as an SEC/NASD Broker/Dealer.

4.    I am an experienced principal for several investment entities. I am President of Great Western Finance, Inc., which, during the last real estate cycle, managed unlimited funds for financing developers, acquiring income-producing assets and private asset based lending. I am also the principal of Loans on Fine Art, LLC, which is a loan brokerage firm that specializes in orchestrating asset based loans using art as collateral and offers short and long term recourse and non-recourse loans from a minimum of $1 million to over $100 million. Additionally, as set forth below, I am the managing member of Apollo Development, LLC ("Apollo").

5.    On April 19, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Northern Division (the "Bankruptcy Court"). I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of the Chapter 11 Case.

6.    Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by the professionals of the Debtor, including the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and the real estate

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2

1    industry.  I am over the age of 18 and am mentally competent.  If called upon to testify, I would

2    testify competently to the facts set forth in this Declaration.

3    7.    To enable the Debtor to minimize the adverse effects of the commencement of this

4    Chapter 11 Case on its business, the Debtor has requested, and will request, various types of relief

5    in a number of applications and motions, including the DIP Motion.  Specifically, the DIP Motion

6    seeks relief intended to maintain the Debtor's business operations and to preserve the value of the

7    Debtor's estate for its stakeholders and parties in interest.  The DIP Motion is crucial to the

8    Debtor's reorganization effort and the value of the Property (defined below).

9    8.    Section I provides an overview of the Debtor's business and corporate structure.

10    Section II describes the Debtor's prepetition debt and capital structure. Section III describes the

11    circumstances that compelled the commencement of the Chapter 11 Case. Section IV describes the

12    Debtor's goals in the Chapter 11 Case and the outlook for the Property (defined below).  Section V

13    provides a summary of the DIP Motion and factual bases for the relief requested therein.

**I.**

**THE DEBTOR'S BUSINESS AND CORPORATE STRUCTURE**

16    9.    The Debtor, Orcutt Rancho, LLC, is a Colorado limited liability corporation, formed,

17    in part, to acquire and entitle three parcels of land into two residential neighborhoods in the

18    unincorporated town of Orcutt, California, which is located in northern Santa Barbara County (the

19    "Property").  The Debtor's original members were Apollo Development, LLC, The HMW Group,

20    LTD. LLC, and Capital Pacific Development Group, Inc.  Effective August 18, 2020, Capital

21    Pacific Development Group, Inc. resigned as a member of the Debtor.  Apollo currently holds

22    74.5% of the outstanding membership interests in the Debtor and The HMW Group LTD. LLC

23    holds 25.5% of the outstanding membership interests in the Debtor.

24    10.    In addition to my experience in the commercial real estate space, The HMW Group,

25    LTD. LLC and the Debtor's former member, Capital Pacific Development Group, Inc., brought

26    substantial experience to bear on the development of the Property.  Anthony E. Wells is a principal

27    of The HMW Group, LTD. LLC and has over 57 years of experience in real estate development,

28    home building and general construction.  Well's entities are directly responsible for site acquisition,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

3

land development, construction, and sale of over $880 million of new residential, commercial, and industrial projects in cities along California's Central Coast, and his companies' residential projects had added more than 2,000 new homes to these communities, including a sizable number of "affordable" homes.

11.    Capital Pacific Development Group, Inc. brought substantial accounting and project management insight to the joint venture to entitle and potentially develop the Property.  Its principal, Gavin Moores, had over 30 years of residential and commercial construction management experience and has the knowledge and experience with his team to build the most sophisticated homes utilizing sustainable building practices.

12.    The Debtor's developer team has employed a highly respected group of expert consultants with over 100 years of experience to guide the Debtor through the entitlement process.

## II.

## PREPETITION DEBT AND CAPITAL STRUCTURE

13.    The Property is encumbered by two deeds of trust in favor of the Debtor's two prepetition secured creditors (collectively, the "Prepetition Secured Creditors").  *First*, Romspen holds a first priority deed of trust dated November 18, 2016 in the principal amount of $5.3 million. Pursuant to a notice of default, recorded on July 7, 2020, Romspen asserts a total secured claim in the amount of $8,235,077.11.  On March 2, 2021, Romspen recorded a notice of foreclosure sale, which is currently scheduled for April 21, 2021.  *Second*, the Debtor's majority member, Apollo, holds a second priority deed of trust dated November 28, 2016 (as amended) in the principal amount of $2,164,850.  Prepetition, the Debtor relied on liquidity from the Prepetition Secured Creditors to fund operations necessary to preserve the value of the Property (defined below) and pursue the Debtor's efforts to obtain entitlements for development of the Property as two residential neighborhoods discussed below.

14.    The Debtor's unsecured creditors can be generally classified into two types.  *First*, the majority of the Debtor's unsecured creditors are trade creditors with debts arising from the ordinary course operations of the Debtor and their related efforts to entitle the Property.  The largest trade debt is owed to the Debtor's former insider, Capital Pacific Development Group, Inc., in the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

4

approximate amount of $312,000 for project management, accounting, and related services. The unsecured claim of Capital Pacific Development Group, Inc. arose after it resigned its membership interests. *Second*, as discussed below, Rancho Maria Golf Club, Inc. filed prepetition litigation against the Debtor for, among other things, quiet title, adverse possession, prescriptive easement, trespass, and declaratory relief, which also includes a request for payment of attorney's fees. The litigation claim is disputed, contingent, and unliquidated as of the Petition Date.

15.    As set forth above, the Debtor relies on access to liquidity from financing sources to continue its efforts to entitle the Property. The Debtor does not generate revenue from operations and does not have further access to equity investment to fund operations. As of the Petition Date, the Debtor's accounts held a total of $1,447.72 cash on hand.

## III.

## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

### A.    The Property

16.    The Property consists of three non-contiguous parcels in northern Santa Barbara County. The Property is identified by the Orcutt Community Plan as a 189.2-acre portion of Key Site 21, a larger 340.78-acre site. Collectively, the Property is currently zoned for a residential subdivision of up to 150 single family homes. The remaining 151.58 acres of Key Site 21 is occupied by the 129.62-acre Rancho Maria Golf Club (the "Golf Course"), a public golf course operated by Rancho Maria Golf Club, Inc., and designated open space.

### B.    The 2013 Action

17.    Prior to the Debtor's acquisition of the Property, the previous owner of the Property, the Erich Joseph Employees' Pension Trust (the "Trust"), filed a complaint against the Golf Course in the California Superior Court for the County of Santa Barbara, Case No. 13cv91010 (the "2013 Action"). In the 2013 Action, the Trust asserted causes of action against the Golf Course for trespass, ejectment, quiet title, declaratory relief, and injunctive relief because the Golf Course constructed portions of the course and related amenities on the Property. The Golf Course filed a cross-complaint based on alleged right to use the Property by virtue of permissive easement.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

5

18.     On September 12, 2013, the Trust and the Golf Course entered into that certain Settlement Agreement.  In relevant part, the Settlement Agreement resolved the 2013 Action, granted the Trust and its successors a permanent easement for primary ingress and egress to California Highway 1 along the western border of the Golf Course that was specifically intended to accommodate a future residential subdivision in the area now planned for the Willow Creek development (as well as an easement for secondary emergency access), and granted the Golf Course an easement over the Property for limited, pre-existing encroachments.

**C.     The Debtors' Acquisition of the Property and Development Plans**

19.     The Debtor acquired the Property in November 2016.  As currently proposed, the Debtor intends to entitle the Property for two distinct neighborhoods surrounding the Golf Course, with separate access, totaling 129 homes.  ***First***, the Hidden Canyon neighborhood will consist of 54 lots with average lot sizes of approximately 10,000 and 12,000 square feet.  ***Second***, Willow Creek will consist of 75 lots with average lot sizes of approximately 8,000 square feet.  The entitlement process for each of the two neighborhoods involves unique challenges, the most distinct of which is access to a public right-of-way.  While the Hidden Creek development abuts California Highway 1, the Willow Creek development is "land-locked" by the Golf Course.

20.     The Debtor worked diligently to obtain the necessary land planning, studies, and engineering to obtain a "complete for processing" determination from the necessary Santa Barbara County departments to proceed to consideration by the Santa Barbara Planning Commission.  In June 2019, the environmental impact study for the project was approved.

21.     Notwithstanding the Settlement Agreement, the Debtor's post-acquisition efforts to entitle the Property has been met with obstinate opposition by the Golf Course.  On August 6, 2019, the Golf Course filed a complaint in the California Superior Court for the County of Santa Barbara, Case No. 19cv04167 (the "2019 Action") against, among others, the Debtor and Romspen—about the same time as the Romspen loan maturity.  The 2019 Action raises claims for quiet title, adverse possession, prescriptive easement, trespass, and declaratory relief.

22.     Further, the Golf Course has subverted the public hearing process before the Planning Commission to delay approval of the proposed entitlements for the Property.  Throughout

Active\121709495.v2-4/21/21

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2020 and 2021, the Golf Course appeared and submitted argument before the Planning Commission that has resulted in material project delays.

23.     The Golf Course has leveraged the 2019 Action and its delay tactics before the Planning Commission in an effort to extract substantial concessions from the Debtor in yet another settlement agreement.  As set forth below, the lis pendens related to this 2019 Action precluded the Debtor from successfully refinancing the Romspen loan in early 2021.  While the parties entered into settlement negotiations, each successive (and purportedly "final") draft of settlement terms has been amended by the Golf Course to extract further concessions from the Debtor.  As of the Petition Date, the parties have not signed a settlement agreement related to the 2019 Action.

**D.     Prepetition Refinancing Efforts**

24.     On July 7, 2020, Romspen filed a notice of default and filed a notice of foreclosure sale, which was originally scheduled for October 7, 2020.  Prior to June 1, 2019, the maturity date of the Romspen loan, and on a continuing exhaustive efforts basis, the Debtor prepared marketing materials to solicit a potential refinancing lender, covering the market of refinance lenders known to the Debtor's principals and advisors.  The Debtor obtained indications of interest for potential refinance lenders and, in some cases, term sheets.  In 2019 concurrent with the maturity of the Romspen loan, and again in early 2021, the Debtor identified a two potential refinancing lender and entered into negotiations, which in the first instance resulted in a loan commitment and in the second instance resulted in draft definitive refinancing documents.  However, as a result of the COVID-19 pandemic, in the first instance, and the lis pendens related to the 2019 Action, in the second instance, the potential refinancing lender was unable to complete refinancing deal and the transaction did not move forward.

25.     The Debtor obtained forbearance of the Romspen loan during this period by paying $150,000 in three monthly payments of $50,000 per month from August 2020 through October 2020. On March 2, 2021, Romspen filed a notice of foreclosure sale scheduled for April 7, 2021.  As of the Petition Date, the foreclosure sale was rescheduled for April 21, 2021.  Throughout this period, the Debtor attempted to unsuccessfully settle the 2019 Action, which settlement efforts were continually frustrated by the Golf Course.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Active\121709495.v2-4/21/21

**IV.**

**CHAPTER 11 GOALS AND PROPERTY OUTLOOK**

26.     Debtor intends to use the Chapter 11 process to evaluate all of their restructuring options and to maximize value for the stakeholders.  The overall goal is to complete the entitlement process before the Santa Barbara County Planning Commission and either refinance the existing secured debt on the Property or sell the Property as-entitled, likely to a homebuilder or similar joint venture.

27.     Based on my experience, I anticipate that the entitlement process will be completed within 18 months of the Petition Date.  The 18-month period is reasonably necessary given the substantial—and unusual—difficulties the Debtor has encountered during the Santa Barbara County Planning Commission approval process, owning, at least in part, to the continued interference of the Golf Course.  Further, the pending 2019 Action may further interfere with the Debtor's entitlement efforts, particularly given that the Golf Course is attempting to claim easements and other rights in the Property.  The Debtor has already been forced to redraft its original proposal for the Property and the 18-month period accounts for the possibility of similar delays.

28.     In 2019, the Debtor obtained an appraisal for the Property.  As of November 2019, the "as-is" value of the Property was appraised at $11 million and the "as-entitled" value was appraised at $16.6 million.  Based on similar developments in the area and the current state of the California real estate market, I believe that the value of the Property, both as-is and as-appraised, has appreciated by up to 20% between the date of the appraisal and the Petition Date.  The Debtor is currently working to obtain an updated appraisal to reflect the value of the Property on or about the Petition Date.

**V.**

**DIP MOTION**

**A.     The Debtor's Need for Postpetition Financing**

29.     As set forth above, as of the Petition Date, the Debtor's accounts held a total of $1,447.93 cash on hand.  The Debtor relies on financing to fund operations necessary for the Debtor to complete its entitlement efforts and maximize the value of the Property.  The Debtor no longer

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

8

has access to financing under the Romspen loan in light of the July 7, 2020, notice of default and pending foreclosure sale. Additionally, the Debtor does not have access to equity funding to continue operations.

30. The Debtor is required to expend funds in the ordinary course of its entitlement efforts. As set forth in the Budget, the principal expenses relate to engagement of ordinary course professionals such as land planners, biological consultants, engineers, surveyors, architects, and land use/entitlement attorneys. The Debtor also relies on project management services and accountants to coordinate the often multifaceted and contemporaneous efforts of the project professionals and address the abbreviated timelines imposed by Santa Barbara County Planning Commission and its affiliated departments. Additionally, the Debtor incurs property tax, insurance, and other costs coincident with its ownership of the Property. Delay in payment of these ordinary course professionals risks delaying the project or failing to meet critical milestones with the Santa Barbara County Planning Commission, which could seriously delay or entirely derail completion of the entitlement process.

31. Absent access to emergency postpetition financing, the Debtor will be unable to meet these critical project deadlines. Further, without access to postpetition financing, the Debtor will lose support from their critical ordinary course professionals, which would further increase the time (and cost) to completion of the entitlement process. Indeed, the Santa Barbara County Planning Commission has continued a hearing on approval or denial of the Debtor's project to Wednesday, April 26, 2021. Without emergency access to the Initial Advance, the Debtor risks failing to meet deadlines imposed by the Planning Commission or adequately representing itself at this upcoming hearing, which would cause irreparable harm to the Debtor. As a result, in order to survive the opening phases of this Chapter 11 Case, the Debtor must obtain approval for the Initial Advance under the DIP Loan Agreement.

32. Going forward, the Debtor must continue to proceed with the entitlement process apace or risk extending the entitlement process beyond the 18-month period provided for in the DIP Loan Agreement. Further, the Debtor must also fund the costs of this Chapter 11 Case—which is

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Active\121709495.v2-4/21/21

1  necessary to maximize the value of the Property—including payment of professional fees and

2  United States Trustee fees.

3      33.    As discussed below, the Debtor's significant efforts to identify additional lenders

4  willing and able to fund the Debtor's continued operations were unsuccessful.  Accordingly, if the

5  DIP Loan Agreement is not approved, the Debtor will likely need to terminate efforts to entitle the

6  Property and conduct a sale (or risk foreclosure) that would not maximize the value of the Debtor's

7  assets.  Accordingly, the Loan is necessary to permit the orderly continuation of the Debtor's efforts

8  to obtain entitlements that would substantially increase the value of the Property, minimize the

9  disruption of the business operations, and preserve and maximize the value of the Debtor's estate.

10  **B.**    **The Debtor's Prepetition Marketing Efforts**

11      34.    The Debtor engaged in substantial prepetition efforts to obtain financing or equity

12  investment (including through a sale of some or all of the Property).  As noted, above, the Debtor

13  received several prepetition indications of interest to purchase all or some of the Property.

14  However, the indications of interest were insufficient in price to satisfy the outstanding, asserted

15  claims secured by the Property.  Additionally, as set forth above, the Debtor engaged in substantial

16  efforts to refinance the Romspen loan; however, despite identifying a lender and exchanging drafts

17  of the definitive loan documents, the proposed refinance lender did not close the transaction due, in

18  part, to the lis pendens recorded by the Golf Course related to the 2019 Action.

19      35.    After the refinancing efforts did not succeed, in early April 2021, the Debtor

20  contacted a potential postpetition lender with whom the Debtor had previously exchanged term

21  sheets.  Despite their prior negotiations, the potential postpetition lender withdrew its term sheet in

22  mid-April 2021.  With the Romspen foreclosure sale looming, the Debtor contacted several

23  potential postpetition lenders and provided each with access to a data room.  Of these several

24  lenders, only the Lender provided a term sheet for proposed postpetition financing.  Additionally,

25  the several lenders that entered into preliminary negotiations with the Debtor offered higher interest

26  rates, fees, and other more onerous terms than the terms offered by the Lender.

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

C.    <u>Negotiation of the Terms of the DIP Loan Agreement</u>

36.    The terms and conditions of the Loan have been the subject of extensive negotiations between the Debtor and the Lender, conducted in good faith and at arm's length, and are fair and reasonable under the circumstances.   A true and correct copy of the DIP Loan Agreement is attached hereto as **Exhibit "A."**  The DIP Loan Agreement is further subject to a proposed Budget. A true and correct copy of the Budget related to the DIP Loan Agreement, which addresses the sources and uses of the Initial Advance and Second Advance, is attached hereto as **Exhibit "B."**

37.    Based on my experience, the terms of the DIP Loan Agreement are similar to those often included in complex financing arrangements and reflect the give and take that result from complex financing negotiations.  For instance, the interest rate of fifteen percent (15%) is reflective of the competitive rates available in the market for financing to a distressed borrower secured by a lien on distressed, undeveloped property.  Further, the DIP Loan Agreement allows the Debtor to accrue 3% of such interest (payable upon maturity) for an effective "pay rate" of 12%.   The effective pay rate is reasonable, in part, when viewed against the non-default interest rates under the Romspen mortgage, which are between 10.75% and 11%.  Additionally, the negotiated interest rate for the unsuccessful refinance proposal for the Romspen mortgage was 12% per annum. Accordingly, the interest rate is reasonable particularly in light of the Accrual Rate set forth in the DIP Loan Agreement, which allows the Debtor to make payments at a 12% per annum rate until Maturity.

38.    Furthermore, the DIP Loan Agreement provides for a Carve-Out in the amount of $200,000.  The Carve Out provides for payment of Estate Professional Fees—including Debtor's counsel and counsel to any Committee—and payment of estimated United States Trustee fees to be incurred during the course of the Chapter 11 Case.  The Events of Default and conditions to borrowing are customary in postpetition financings, as is the Lender's ability to exercise remedies upon the occurrence of an Event of Default.  The Lender does not unduly seek to control or restrict the Debtor's ability to prosecute the Chapter 11 Case.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Active\121709495.v2-4/21/21

1   39.    Moreover, the Loan does not impose any milestones or deadlines in connection with

2   any Plan.  Instead, the Lender simply requested reasonable protections to secure repayment of the

3   funds it is advancing in the form of the Loan.

4   40.    Without the Loan, the Debtor would not be able to fund operations or proceed with a

5   plan of reorganization.    Instead, Debtor would be faced with the potential of foreclosure,

6   administrative insolvency and a liquidation.  Given the choice between these two alternatives, and

7   based on the terms of the DIP Loan Agreement, I believe that the DIP Loan Agreement is in the

8   best interests of the Debtor and its estate and offer the Debtor the time needed to secure to bring the

9   Chapter 11 Case to a successful conclusion.

10  **D.    Adequate Protection for the Prepetition Secured Creditors**

11  41.    The Debtor proposes two forms of adequate protection for imposition of first priority

12  priming liens on the Property secured by Romspen's secured claim: (i) adequate protection

13  payments; and (ii) preservation of the Debtor's equity cushion through continuous maintenance of

14  the Property.  *First*, as set forth above, the Property (even in its un-entitled state) was appraised at

15  approximately $11 million in November 2019, and the as-entitled value of the Property is estimated

16  at $16.6 million.  To preserve the value of the Property, the Debtor will use Loan proceeds, in

17  accordance with the Budget and in the ordinary course, to maintain the value of the Property

18  securing Romspen's claim.  *Second*, in addition to the equity in the Property, discussed above, the

19  Budget in support of the Loan allocates $225,000 for monthly adequate protection payments to

20  Romspen over the 18 month term of the Loan, e.g., 18 monthly payments of $12,500.  The proposed

21  adequate protection is calculated as 2.5% simple interest on the outstanding principal balance of the

22  Romspen loan in the approximate amount of $5.92 million.

23  42.    With respect to Apollo, the Budget in support of the Loan allocates $90,000 for

24  monthly adequate protection payments to Apollo over the 18 month term of the Loan, e.g., 18

25  monthly payments of $5,000.  Apollo has consented to the foregoing proposed adequate protection.

26  **E.    The Break-Up Fee**

27  43.    The Break-Up Fee is reasonable under the circumstances and in the best interests of

28  the Debtor and its estate.  The proposed Break-Up Fee will fairly and reasonably compensate the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Active\121709495.v2-4/21/21

1    Lender for taking actions that will benefit the Debtor's estates, including undertaking diligence on

2    the short timeline necessitated by this Chapter 11 Case and professional fees incurred in negotiating

3    the terms of the DIP Loan Agreement on an expedited timeline.   Notwithstanding the substantial

4    time and expense the Lender incurred in negotiating the DIP Loan Agreement, the Break-Up Fee

5    still offers the Debtor the opportunity to pursue alternative (but, following the Debtor's marketing

6    efforts, very unlikely) funding sources on the best possible terms available to the estate, should any

7    appear prior to approval of the DIP Loan Agreement.   In the event the Court approves the DIP Loan

8    Agreement on a final basis, the Break-Up Fee will be applied toward payment of the Interest

9    Reserve upon the funding of the Second Advance.

10        I declare under penalty of perjury that the foregoing statements are true and correct to the

11   best of my information, knowledge and belief.

12        Executed this 21st day of April, 2021.

14                                                        _____

15                                                        Gary Greenberg

13

# EXHIBIT A

*Execution Copy*

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "DIP Loan Agreement"), dated as of April 19, 2021, is entered into by and between **ORCUTT RANCHO LLC**, a Colorado limited liability company ("Borrower"), and **SANTA MARIA DIP LLC**, an Illinois limited liability company ("Lender").

## W I T N E S E T H:

**WHEREAS**, Borrower intends on filing a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § § 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). Borrower further intends to continue to operate its business and manage its assets and liabilities as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (in such capacity as a debtor-in-possession, "Debtor").

**WHEREAS**, Borrower has requested that Lender provide a senior secured, superpriority loan to Borrower, as Debtor, in the principal amount of Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00) (the "DIP Loan Amount") to fund (i) immediate working capital needs of Debtor, including, the allowed administrative costs and expenses of the Chapter 11 Case and (ii) certain post-petition administrative claims of Lender.

**WHEREAS**, Lender is willing to make a loan in the DIP Loan Amount upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and of the mutual covenants, conditions and provisions hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.    Definitions.  As used in this DIP Loan Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Debtor arising out of the sale or lease of goods or the rendering of services by Debtor, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Debtor or Debtor's books and records relating to any of the foregoing.

"Accrual Rate" means that portion of the Interest Rate charged hereunder equal to three percent (3%) per annum.

"Advance" means, collectively, the Initial Advance and the Second Advance.

"Avoidance Actions" means avoidance actions under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning set forth in the recitals of this DIP Loan Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals of this DIP Loan Agreement.

"Bankruptcy Laws" means the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Court's Local Rules, and, to the extent applicable, the rules, regulations and requirements of the Office of the United States Trustee.

"Bar Date" means the bar date for filing proofs of claim against Debtor on account of claims.

"Break-Up Fee" has the meaning set forth in Section 2(o) of this DIP Loan Agreement.

"Budget" has the meaning set forth in Section 5(h) of this DIP Loan Agreement.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in Santa Maria, California are required or permitted to be closed.

"Carve Out" means the following carve-out from the Liens granted hereunder and under the Financing Orders in an amount equal to: (i) all fees required to be paid under 28 U.S.C. § 1930(a); (ii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses accrued or incurred by Persons or firms retained by the Debtor and the Committee pursuant to Sections 327, 328 363 or 1103 of the Bankruptcy Code (collectively, the "Estate Professionals"; such fees and expenses, the "Estate's Professional Fees") at any time before the first Business Day following delivery by Lender of a Carve-Out Trigger Notice (the "Carve-Out Trigger Date"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iii) Estate's Professional Fees in an aggregate amount not to exceed $200,000 (the "Carve-Out Trigger Cap") incurred on or after the first business day following delivery by Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise. Any payment or reimbursement made on or after the Carve-Out Trigger Date on account of Estate's Professional Fees incurred on or after the first Business Day following delivery by Lender of the Carve-Out Trigger Notice shall permanently reduce the Carve-Out on a dollar-for-dollar basis. To the extent that any payment to an Estate's Professional is subsequently disallowed or disgorged, such amounts shall constitute Collateral for all purposes hereunder, subject to the Liens granted hereunder and under the Financing Orders. In no event shall any fee, expense or other amount incurred in connection with investigating or pursuing claims against Lender, or in objecting to any relief supported by Lender, be paid from the Carve-Out. Lender shall not be responsible for the direct payment or reimbursement of any Estate's Professional Fee. For the avoidance of doubt, nothing contained herein or in any Loan Document is intended to be or shall be construed as consent to the allowance of any Estate's Professional Fee.

"Carve-Out Trigger Notice" shall mean notice, following the occurrence of an Event of Default, by Lender to counsel to the Debtor, counsel to the Committee, and the U.S. Trustee of the imposition of the Carve-Out Trigger Cap.

"Change of Control" means, at any time, Gary Greenberg ceases to own and control, of record and beneficially, directly or indirectly, all of the outstanding Equity Interests of Debtor, free

2

and clear of all Liens other than the Liens in favor of Lender.  For the avoidance of doubt, neither the appointment by Gary Greenberg of members of the board of directors, managers, or other applicable governing body of the Debtor nor the issuance of any class of Equity Interests of Debtor to Gary Greenberg shall itself constitute a "Change of Control."

"Chapter 11 Case" has the meaning set forth in the recitals of this DIP Loan Agreement.

"Closing Date" means the date of funding of the Initial Advance.

"Collateral" means all Debtor's right, title and interest in and to all of the following presently existing and hereafter acquired or arising property, wherever located: all Property, including all Improvements; Accounts; Receivables; chattel paper (including tangible and electronic chattel paper); deposit accounts; securities accounts; documents (including negotiable documents); Equipment (including all accessions and additions thereto); general intangibles (including payment intangibles and software); Intellectual Property; goods (including fixtures); instruments (including promissory notes); Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions); investment property (including securities and securities entitlements); Negotiable Collateral, including letter of credit rights; money; commercial tort claims; all books and records with respect to any of the foregoing and the computers and equipment containing any such books and records; all contract rights, development and use rights, governmental permits and licenses, applications, architectural and engineering plans, specifications and drawings, any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment; provided, however, that the term "Collateral" expressly excludes the Avoidance Actions.

"Committee" means the committee of unsecured creditors appointed in the Chapter 11 Case by the U.S. Trustee pursuant to the Bankruptcy Code.

"Common Materials" has the meaning set forth in Section 7(j)(ii)(A).

"Copyrights" means all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Default Rate" means a rate per annum equal to twenty-four percent (24%), computed on a 360-day year and charged on the basis of actual days elapsed.

"DIP Loan Agreement" has the meaning set forth in the preamble of this DIP Loan Agreement.

"DIP Loan Amount" has the meaning set forth in the recitals of this DIP Loan Agreement.

3

"DIP Motion" means the motion filed pursuant to Sections 105, 361, 363, 364(c)(1), 364(c)(2), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code seeking approval of the Loan and entry of the Financing Orders.

"Environmental Indemnity Agreement" means the Environmental Indemnity Agreement of even date herewith executed and delivered by the Indemnitors to Lender.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Debtor has any interest.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Event of Default" has the meaning set forth in Section 8 of this DIP Loan Agreement.

"Exit Fee" has the meaning set forth in Section 2(h) of this DIP Loan Agreement.

"FATCA" means Sections 1471-1474 of the Internal Revenue Code of 1986, as of the date of this DIP Loan Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations thereunder.

"Final Financing Order" has the meaning set forth in Section 5(b)(ii) of this DIP Loan Agreement.

"Financing Orders" means individually or collectively, as the context may allow, the Interim Financing Order and the Final Financing Order.

"Governmental Authority" means any nation or government, any state, city, province or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Indemnified Matters" has the meaning set forth in Section 7(j)(v).

"Hazardous Materials" has the meaning set forth in Section 7(j)(i)(A).

"Hazardous Materials Claims" has the meaning set forth in Section 7(j)(i)(C).

"Hazardous Materials Laws" has the meaning set forth in Section 7(j)(i)(B).

"Improvements" means the buildings and other structures now or hereinafter located on the Collateral, together with all necessary or required site improvements and all appurtenances and fixtures and all tenant improvements.

"Indemnitees" has the meaning set forth in Section 11(a).

4

"Initial Advance" means an initial advance of the Loan proceeds in an amount equal to Four Hundred Fifty-Seven Thousand Sixty-Eight Dollars and No/100 Dollars ($457,068.00).

"Initial Fee" means an initial fee of Ten Thousand and No/Dollars ($10,000.00), which was paid to Lender by Borrower upon execution of the Loan commitment letter from Lender to Debtor dated April 14, 2021, which Initial Fee was fully earned and non-refundable upon receipt by Lender.

"Intellectual Property" means all of Debtor's right, title, and interest in and to the following: Copyrights, Trademarks and Patents; all trade secrets, all design rights, claims for damages by way of past, present and future infringement of the Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation, all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Interest Rate" means a rate per annum equal to fifteen percent (15%), computed based on a 360-day year and charged on the basis of actual days elapsed.

"Interest Reserve" means the aggregate sum of Four Hundred Sixty Thousand and No/100 Dollars ($460,000.00),  a portion of which equal to Twenty-Three Thousand and No/100 Dollars ($23,000) to be deposited in the Interest Reserve Account on the Closing Date from the proceeds of the Initial Advance and the remainder of which equal to Four Hundred Thirty-Seven Thousand and No/100 Dollars ($437,000.00) to be deposited in the Interest Reserve Account from the proceeds of the Second Advance upon entry of the Final Financing Order from the Bankruptcy Court.  In no event shall Debtor have any right to withdraw or direct disbursement of all or any portion of the funds in the Interest Reserve Account.

"Interest Reserve Account" means an account established for the benefit of and held by Lender and initially funded with the Interest Reserve.  In no event shall Debtor have any right to withdraw or direct disbursement of all or any portion of the funds in the Interest Reserve Account.

"Interim Financing Order" has the meaning set forth in Section 5(b)(i) of this DIP Loan Agreement.

"Inventory" means all inventory in which Debtor has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Debtor, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Debtor's books and records relating to any of the foregoing.

"Leases" means all leases, licenses or other agreements providing for the use or occupancy of any portion of the Collateral, including all amendments, extensions, renewals, supplements, modifications, sublets and assignments thereof and all separate letters or separate agreements relating thereto.

5

"<u>Lender</u>" has the meaning set forth in the preamble of this DIP Loan Agreement

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement or any financing lease having substantially the same economic effect as any of the foregoing) and, in the case of debt, equity or similar instrument, any purchase option, call or similar right of any Person (other than the issuer of such securities) with respect to such debt, equity or similar instrument.

"<u>Loan</u>" means the loan made pursuant to this DIP Loan Agreement.

"<u>Loan Documents</u>" means (i) this DIP Loan Agreement, (ii) the Financing Order, (iii) the Note, (iv) the Environmental Indemnity Agreement, and (v) all other security agreements, pledge agreements, patent, trademark and copyright security agreements, control agreements, financing statements and any other instruments and documents requested by Lender creating or purporting to create a Lien on the Collateral and/or reasonably related to the foregoing, and all amendments, restatements, modifications or supplements thereof or thereto.

"<u>Maturity Date</u>" means the earlier of (a) October 31, 2022, or (b) the date of acceleration of any of the Obligations pursuant to <u>Section 10(a)</u>.

"<u>Negotiable Collateral</u>" means all letters of credit of which Debtor is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Debtor's books and records relating to any of the foregoing.

"<u>Non-Excluded Taxes</u>" has the meaning set forth in <u>Section 2(n)(i)</u> of this DIP Loan Agreement.

"<u>Note</u>" means the Secured Note of even date herewith executed and delivered by Debtor to Lender.

"<u>Obligations</u>" means all loans, advances, liabilities, obligations, covenants, duties, and debts owing by Debtor to Lender arising under or pursuant to this DIP Loan Agreement or any of the other Loan Documents, whether or not evidenced by any note, other instrument or document, whether arising from an extension of credit, acceptance, loan, guaranty, indemnification, or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees, and any other sums chargeable hereunder or under any of the other Loan Documents including, without limitation, all debts, liabilities, and obligations of Debtor now or hereafter arising from or in connection with the Loan.

"<u>Other Taxes</u>" means any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from the execution, delivery, enforcement

6

or registration of, or otherwise with respect to, this DIP Loan Agreement, except any amounts that are imposed with respect to an assignment.

"Origination Fee" has the meaning set forth in Section 2(c) of this DIP Loan Agreement.

"Patents" means all patents, patent applications and like protections including without limitation, improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Pay Rate" means that portion of the Interest Rate charged hereunder equal to twelve percent (12%) per annum.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or Governmental Authority.

"Property" means all the real property owned by Debtor, including without limitation, approximately 189.2 acres of real property consisting of three non-contiguous parcels generally located along the west side of Cabrillo Highway at Casmalia Road in Santa Barbara County, California, as more specifically described on Exhibit A hereto.

"REA" means any reciprocal easement agreements, redevelopment agreements, covenants, conditions, and easements, or the like (together with any amendments or modifications thereto), if any, concerning the Property (or any portion thereof), executed by and between Debtor (or any predecessors-in-interest) and owners of adjacent property.

"Receivables" means Accounts, chattel paper, documents, investment property, instruments and any other rights or claims to receive money which are general intangibles or which are otherwise included as Collateral.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interests in Debtor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Debtor or any option, warrant or other right to acquire any such Equity Interests in any Debtor.

"Second Advance" means an advance of the Loan proceeds in an amount not to exceed Two Million Forty-Two Thousand Nine Hundred Thirty-Two Dollars and No/100 Dollars ($2,042,932.00).

"Trademarks" means any trademark and servicemark rights of Debtor, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business connected with and symbolized by such trademarks.

"Title Insurance Policy" means one or more ALTA Lender's Policies of Title Insurance, in form and substance acceptable to Lender in its sole and absolute discretion, as issued by a title

company acceptable to Lender with extended coverage and containing such endorsements as Lender may require including, without limitation, as applicable, an ALTA 8.1.06 Commercial Environmental Protection Lien Endorsement, an ALTA 9-06 Restrictions, Encroachments, and Mineral Endorsement, an ALTA 12-06 Aggregation Endorsement, an access endorsement, a tax parcel endorsement, a subdivision endorsement, a usury endorsement, a survey endorsement (if applicable), a covenants, conditions and restrictions endorsement, a 3.01-06 zoning endorsement, a contiguity endorsement (if applicable), a waiver of arbitration endorsement (if applicable), and an electronic policy/lack of signatures endorsement.

    2.    <u>Loan Facility</u>.

    (a)    <u>Loan and Use of Proceeds</u>.  Debtor desires to borrow from Lender the DIP Loan Amount, which shall be utilized by Debtor to fund (i) immediate working capital needs of Debtor, including, the allowed administrative costs and expenses of the Chapter 11 Case and (ii) post-petition administrative claims of Lender.  Debtor acknowledges and agrees that Lender has not made any commitments either express or implied to disburse funds in excess of the DIP Loan Amount or to extend the term of the DIP Loan past the Maturity Date.

    (b)    <u>Advances</u>.  Subject to the satisfaction of the conditions precedent set forth in <u>Section 5</u> below, in Lender's sole and absolute discretion, the Loan proceeds shall be advanced by Lender to Borrower as follows:

    (i)    The Initial Advance (less any fees, costs and expenses due Lender hereunder which will be net funded) shall be funded within two (2) Business Days of the Bankruptcy Court entering the Interim Financing Order.

    (ii)    The Second Advance (less any fees, costs and expenses due Lender hereunder which will be net funded) shall be funded within two (2) Business Days of the Final Financing Order becoming a final, non-appealable order in the Bankruptcy Case.

    (iii)    Each disbursement by Lender to Debtor shall be promptly made to Debtor in U.S. Dollars and in immediately available funds by direct deposit to the debtor-in-possession deposit account as specified in writing by Debtor to Lender or, to the extent such direct deposit is determined by Lender to not be available or otherwise practical, by mail to the notice address of Debtor as set forth below. Such delivery locations may be changed by Debtor from time to time subject to the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

    (c)    <u>Loan Fee</u>.  Debtor shall pay Lender a loan fee for the Loan in the amount of Seventy-Five Thousand and No/100 Dollars ($75,000.00) (the "<u>Origination Fee</u>"). The Origination Fee shall be paid on the Closing Date from the funding of the Loan and shall be deemed fully earned, payable and non-refundable upon receipt by Lender. Lender acknowledges that the Initial Fee paid by Debtor to Lender on or before the execution of this DIP Loan Agreement, shall be applied toward payment of the Origination Fee upon the Closing Date.

(d)    <u>Reimbursement Costs</u>.  On the Closing Date, Debtor agrees to reimburse Lender, payable from the funding of the Loan, all expenses Lender incurs with respect to this Loan, including without limitation, all fees, costs and expenses of Lender incurred in connection with the negotiation, preparation and administration of the Loan, this DIP Loan Agreement, the Loan Documents and any other agreements or instruments related thereto.

(e)    <u>Loan Documents</u>.  Debtor shall deliver to Lender concurrently with this DIP Loan Agreement each of the Loan Documents, properly executed and, as applicable, in recordable form.

(f)    <u>DIP Loan Agreement Date</u>.  The Loan Documents shall become effective on the date of this DIP Loan Agreement.

(g)    <u>Maturity Date</u>.  On the Maturity Date, all Obligations due and owing under the Loan Documents shall be repaid in full in immediately available funds.

(h)    <u>Exit Fee</u>.  Debtor shall pay Lender an exit fee for the Loan in the amount of Fifty Thousand and No/100 Dollars ($50,000.00) (the "<u>Exit Fee</u>"). The Exit Fee shall be due and payable on the earlier of (a) the date Debtor repays the Loan in full, or (b) the Maturity Date.

(i)    <u>Interest Rate</u>.  All disbursement of Loan proceeds shall bear interest at the Interest Rate, subject to the Default Interest provisions contained herein.

(j)    <u>Interest Reserve</u>.  The Interest Reserve shall be funded from the proceeds of the Loan into the Interest Reserve Account in two tranches: (i) the first tranche in the amount of Twenty-Three Thousand and No/100 Dollars ($23,000) shall be funded from the Loan proceeds of the Initial Advance, and (ii) the second tranche in the amount of Four Hundred Thirty-Seven Thousand and No/100 Dollars ($437,000.00) shall be funded from the Loan proceeds of the Second Advance.  To the extent funds are available in the Interest Reserve and provided that no Event of Default then exists, Lender shall make monthly payments of interest from the Interest Reserve as and when such payments are due.  Debtor hereby irrevocably authorizes Lender to make any payment of interest on the Note by debiting the Interest Reserve Account in the amount of accrued and unpaid interest on the Note.  Debtor hereby irrevocably grants and assigns to Lender a senior secured, superpriority security interest in and to all amounts held at any time in the Interest Reserve Account.  The funds in the Interest Reserve Account shall be held by Lender as additional security for Debtor's Obligations under the Loan Documents.  Any such funds held by or for the benefit of Lender in the Interest Reserve Account shall not be claimed to be held in trust and shall not bear interest except to the extent, if any, required by law.  To the extent funds are available in the Interest Reserve and provided that no Event of Default then exists, Lender shall make payments of interest from the Interest Reserve as and when such payments are due.  Debtor hereby irrevocably authorizes Lender to make any payment of interest on the Note by debiting the Interest Reserve Account in the amount of accrued and unpaid interest on the Note.  To the extent that there is no Event of Default and Debtor pre-pays the Loan in accordance with the terms of this Loan Agreement, any funds remaining in the Interest Reserve after all accrued interest is satisfied shall be credited to the Loan balance at payoff.

(k)    <u>Late Charges and Default Interest</u>.

9

(i)    If any payment of interest required under any of the Loan Documents is not received by Lender on or before the date such payment becomes due, Debtor shall pay to Lender a late charge equal to five percent (5%) of the amount of such unpaid payment to defray part of the increased cost of collecting late payments and the opportunity costs incurred by Lender because of the unavailability of the funds.  If such interest payment is not received by Lender on or before the date when it becomes due, Debtor shall pay interest on the entire outstanding principal balance of the Note at the Default Rate from and after the date when the payment was due until paid.

(ii)    If any payment of principal required under the Loan Documents (including, without limitation, the principal payment due on the Maturity Date) is not received by Lender on or before the date such payment becomes due, Debtor shall pay to Lender a late charge equal to five (5%) of the amount of such unpaid payment to defray part of the increased cost of collecting late payments and the opportunity costs incurred by Lender because of the unavailability of the funds.  If any payment of principal required under the Loan Documents (including , without limitation, the principal payment due on the Maturity Date) is not received by Lender on or before the date such payment becomes due, Debtor shall, in addition to the late charges described above also pay interest on the entire outstanding principal balance of the Note at the Default Rate from and after the date when the payment was due.

(iii)    Effective immediately upon the occurrence of, and during the continuance of, any Event of Default that remains uncured beyond any applicable notice and cure period, other than default in the payment of interest or principal as described in the preceding two paragraphs, the balance of the Note then outstanding shall bear interest at the Default Rate.  In addition, all other amounts due Lender (whether directly or for reimbursement) under the Note, this DIP Loan Agreement or any of the other Loan Documents, if not paid when due or, in the event no time period is expressed, if not paid within five (5) days after written notice from Lender that the same has become due, shall also bear interest thereafter at the Default Rate until paid.

(l)    <u>Computation of Interest</u>.  Interest shall be computed on the basis of the actual number of days elapsed in the period during which interest accrues and a year of 360 days.  In computing interest, the date of funding and the date of payment shall be included; <u>provided, however,</u> that if any funding is repaid on the same day on which it is made, one day's interest shall be paid thereon.  Notwithstanding any of the terms and conditions contained in this Section, interest in respect of any amount of the Loan shall not exceed the maximum rate permitted by applicable law.

(m)    <u>Debtor's Grant of Super Priority Nature of Obligations and Lender's Liens</u>.  Debtor hereby grants Lender a continuing Lien on and security interest in all of Debtor's right, title and interest in and to the Collateral.  Debtor hereby covenants, represents and warrants that the Loan and Obligations:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed claims in the Chapter 11 Case having priority over any and all

10

administrative expenses and all other claims against Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503, 507, 546, and 726 of the Bankruptcy Code, provided, however, that such superpriority administrative claim shall be subject to the Carve Out and shall not be collectible from Avoidance Actions;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable and fully perfected first priority senior security interest in and Lien on all Collateral that is not otherwise subject to a Lien; provided, however, that this Lien on the deposit accounts and Accounts of the Debtor shall be subject to the Carve Out;

(iii)    pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable and fully perfected first priority senior priming security interest in and senior priming Lien on all Collateral that is subject to existing Liens; and

(iv)    pursuant to the Financing Orders, the Liens in favor of Lender in the Collateral shall be perfected without the recordation or filing of any instruments of mortgage, assignment or financing.  Debtor further agrees that, upon the request of Lender, Debtor (i) shall enter into separate deeds of trust in recordable form on terms reasonably satisfactory to Lender with respect to any Collateral, (ii) authorize Lender to file and record such financing statements and fixture filings with respect to any Collateral identified by Lender, and (iii) take any such other action as required by Lender with respect to the Collateral identified by Lender in order to evidence the perfection of the Liens granted hereby.

(v)    Upon the Closing Date, on behalf of itself and its estates, and for so long as any Obligation shall be outstanding, Debtor hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve or grant a claim of equal or greater priority than the Obligations.

(n)    <u>Taxes</u>.

(i)    All payments made by Debtor under this DIP Loan Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding (A) net income taxes and franchise taxes (imposed in lieu of net income taxes) now or hereinafter imposed on Lender as a result of a present or former connection between such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this DIP Loan Agreement), (B) any branch profits taxes imposed by the United States of America, (C)

11

any U.S. federal withholding tax imposed pursuant to a law in effect on the date that Lender became a party to this DIP Loan Agreement, or became a Lender or changed its lending office, except to the extent that amounts with respect to such withholding tax were payable either to such Lender's assignor immediately before such Lender became a party to this DIP Loan Agreement or to such Lender immediately before it changed its lending office, (D) any tax that is attributable to Lender's failure to furnish any documents or forms that Lender is legally entitled to furnish the provision of which would result in a reduced amount, or no amount, of tax required to be withheld and/or paid by Debtor or otherwise in respect of Lender and (E) any taxes imposed pursuant to FATCA.  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings (collectively, "Non-Excluded Taxes") are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this DIP Loan Agreement.

(ii)    Debtor shall be obligated to pay, and shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    Whenever any Non-Excluded Taxes or Other Taxes are payable by Debtor, as promptly as possible thereafter, Debtor shall send to Lender a certified copy of an original official receipt received by such Debtor showing payment thereof or other evidence reasonably acceptable to Lender.  If Debtor fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate Governmental Authority or fails to remit to Lender the required receipts or other required documentary evidence or if any Governmental Authority seeks to collect a Non-Excluded Tax or Other Tax directly from Lender for any other reason, Debtor agrees to indemnify Lender for any Non-Excluded Taxes or Other Taxes, interest or penalties that may become payable by Lender.

(iv)    The agreements in this Section 2 shall survive the satisfaction and payment of the Obligations and the termination of this DIP Loan Agreement.

(o)    Break-Up Fee. Debtor shall pay Lender a break-up fee for the Loan in the amount of Fifty Thousand and No/100 Dollars ($50,000.00) (the "Break-Up Fee"). The Break-Up Fee shall be paid on the Closing Date from the funding of the Loan and shall be deemed fully earned, payable and non-refundable upon receipt by Lender. In the event the Loan is approved by the Bankruptcy Court and the Final Financing Order becomes a final, non-appealable order in the Bankruptcy Case as required under Section 5(d)(ii) below, Lender acknowledges that the Break-Up Fee shall be applied toward payment of the Interest Reserve upon the funding of the Second Advance.

3.    Payment Generally.

(a)    Promissory Note.  The obligation of Debtor to repay the outstanding principal balance of all Advances made under this DIP Loan Agreement, plus interest accrued thereof, shall

12

be evidenced by the Note in the original principal amount of the Loan, payable to the order of Lender, duly executed by Debtor of even date herewith.

    (b)    <u>Payments</u>.

    (i)    Debtor shall make monthly interest payments on the 1st day of each month, commencing on May 1, 2021 and continuing on the 1st day of each month thereafter through and including the Maturity Date, in the amount of interest at the Pay Rate. To the extent funds are available in the Interest Reserve and provided that no Event of Default then exists, Lender shall make monthly payments of interest from the Interest Reserve as and when such payments are due.

    (ii)    Interest at the Accrual Rate shall accrue during the term of the Loan.

    (iii)    Debtor shall repay in full in cash on the Maturity Date, the outstanding principal amount of the Loan, together with any accrued and unpaid interest on such principal amount, the Exit Fee and all other Obligations.

    (c)    <u>Optional Prepayments</u>.  Debtor may, at any time, prepay the Loan in whole but not in part without any penalty or premium, provided, however, any such prepayment shall include payment of the Exit Fee.

    (d)    <u>Manner and Time of Payment</u>.  All payments of principal, interest and fees hereunder payable to Lender shall be made without condition or reservation of rights and free of set-offs or counterclaims, in U.S. dollars and by ACH or wire transfer (pursuant to Lender's written wire transfer instructions) of immediately available funds delivered to Lender not later than 1:00 p.m. (Pacific Time) on the due date.  Funds received by Lender after that time and date shall be deemed to have been paid on the next Business Day.

    (e)    <u>Payments on Non-Business Days</u>.  Whenever any payment to be made by Debtor hereunder shall be stated to be due on a day which is not a Business Day, payments shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

    (f)    <u>Application of Payments</u>.  At Lender's sole and absolute discretion, all payments received by Lender on account of Debtor's Obligations under the Loan Documents shall be applied as follows, subject to all applicable laws: (a) first, to payment of all unpaid fees and expenses owing under the Loan Documents, (b) second, to the payment of all accrued and unpaid interest owing under the Loan Documents and (c) third, to the payment of the outstanding principal amount of the Loan.  Upon the occurrence and during the continuance of an Event of Default that remains uncured beyond any applicable notice and cure period, Lender shall have the right to apply such payments in such order and manner as Lender may determine in its sole and absolute discretion.

    4.    <u>Insurance</u>.  Debtor, at its sole cost and expense, shall insure or cause to be insured and keep insured the Collateral against such perils and hazards, and in such amounts and with such

limits, as Lender may from time to time require, and, in the event, including without limitation, the following coverage with respect to the Collateral:

(a)      All Risk.  Insurance against loss of the Collateral which, during any construction, shall be on an "All Risk" perils "Builders' Risk," monthly reporting or non-reporting "Completed Value" form and, after completion of construction, shall be on an "All Risk" policy form covering, in each case, theft, terrorism, and insurance against such other risks as Lender may reasonably require.  Such policies shall be in amounts equal to the full replacement cost of the Collateral (including any related improvements, and specifically, Debtor's interest in any leasehold improvements).

(b)      Public Liability.  Commercial general public liability insurance against death, bodily injury and property damage arising in connection with the Collateral with limits of not less than $2,000,000 per occurrence.  Such policy shall be written on an occurrence form and shall list the Debtor as the named insured, shall designate thereon the location of the Property and shall have such limits as Lender may reasonably require.

(c)      Contractor's Insurance.  During the entire period of renovation and construction on any of the Collateral, the Debtor shall cause to be furnished to Debtor and, upon request by Lender, to Lender certificates from the insurance carrier for the contractors evidencing worker's compensation, employers' liability, commercial auto liability, excess umbrella liability coverage and commercial general liability insurance (including contractors liability and completed operations coverage) written on an occurrence form, with such general liability limits as Lender may reasonably require.  The Debtor shall be named as an additional insured under such liability policies.  The Debtor shall cause each subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability and excess umbrella liability coverage in form and amount reasonably satisfactory to Lender.

(d)      Other Insurance.  Such other insurance relating to the Property and the use and operation thereof as Lender may, from time to time, require.

(e)      Policy Requirements.  All insurance shall be carried in companies reasonably acceptable to Lender and all policies shall name Lender as an additional insured, mortgagee, and loss payee.  Furthermore, all insurance shall be in form and content reasonably acceptable to Lender, provide ten (10) days' advance written notice to Lender before any cancellation, adverse material modification or notice of non-payment and, to the extent limits are not otherwise specified herein, contain deductibles which are in amounts acceptable to Lender.  Lender shall be specifically named in all policies as an additional insured.  All physical damage policies and renewals shall contain a standard mortgage clause naming Lender as mortgagee, which clause shall expressly state that any breach of any condition or warranty by Debtor shall not prejudice the rights of Lender under such insurance, as well as a loss payable clause in favor of Lender for personal property, contents, inventory and equipment.  No additional parties shall appear in the mortgage or loss payable clause with respect to the Collateral without Lender's prior written consent except for such policies existing as of the date of this DIP Loan Agreement with respect to personal property, including, without limitation equipment.  All evidence of insurance shall reference the

14

specific projects being covered by name and address and shall otherwise be in form and substance acceptable to Lender.  All deductibles shall be in amounts acceptable to Lender.

(f)     <u>Notice; Evidence of Renewal</u>.  Any notice pertaining to insurance and required pursuant to this Section shall be given in the manner provided herein and at any additional address of which Lender gives Debtor prior written notice.  Debtor shall use its best efforts to deliver to Lender evidence of renewal satisfactory to Lender at least five (5) Business Days before the expiration of existing policies or any prior renewal thereof.  If Lender has not received satisfactory evidence of such renewal or substitute insurance in the time frame herein specified, Lender shall have the right, but not the obligation, to purchase such insurance without prior notice to Debtor. Any amounts so disbursed by Lender pursuant to this Section shall be a part of the Loan and shall bear interest at the Default Rate.  Nothing contained in this Section shall require Lender to incur any expense or take any action hereunder, and inaction by Lender shall never be considered a waiver of any right accruing to Lender on account of this <u>Section 4</u>.

(g)     <u>Separate Insurance</u>.  Debtor shall not carry any separate insurance on the Collateral concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Lender's prior written consent and, in the event Lender grants its consent, any such policy shall nevertheless have attached thereto a standard non-contributing mortgagee clause, with loss payable to Lender, and shall otherwise meet all other requirements set forth in this <u>Section 4</u>.

(h)     <u>Standard Insurance Requirements</u>.  Without limitation of the terms and provisions of this <u>Section 4</u>, Debtor agrees that they shall comply with the insurance requirements set forth on Exhibit D attached hereto.  In the event of any conflict between any terms or provisions of this <u>Section 4</u> and Exhibit C, the terms of Exhibit C shall control.

5.     <u>Conditions Precedent</u>.  This DIP Loan Agreement shall become effective as of the date first above written upon, and the obligation of Lender to make the Loan or make any Advance to the Debtor is subject to satisfaction of each of the following (unless otherwise waived in writing by Lender):

(a)     <u>DIP Loan Agreement</u>.  Debtor and Lender shall have executed (to the extent applicable) and/or delivered, or caused to be delivered, to Lender (i) this DIP Loan Agreement, (ii) each Loan Document, (iii) any other documents reasonably required by Lender to evidence the Liens on the Collateral (subject to the Carve Out as set forth herein) or other customary closing deliverables and (iv) a notice of pendency of the Chapter 11 Case and the subordination of interests as ordered by the Bankruptcy Court in the Financing Orders in a form appropriate for recordation in Santa Barbara County, State of California, and in the case of (i) through (iv), each in form acceptable to Lender in its sole and absolute discretion.

(b)     <u>Approvals</u>.  Lender shall have received satisfactory evidence that Debtor has obtained all required consents and approvals of all Persons in connection with the filing of the Chapter 11 Case, the execution, delivery and performance of the Loan Documents, and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the transactions contemplated hereby.

15

(c)    <u>DIP Motion</u>.  Lender shall have approved the DIP Motion filed in the Chapter 11 Case.

(d)    <u>Financing Orders</u>.

(i)    With respect to the obligation of Lender to make the Initial Advance to the Debtor, an order of the Bankruptcy Court in the Bankruptcy Case, in form and substance satisfactory to Lender in its sole and absolute discretion, (i) approving the Debtor obtaining the Initial Advance and the Loan Documents on an interim basis, (ii) granting the Collateral described in this DIP Loan Agreement, and (iii) setting a final hearing within twenty (20) days of the entry of the Interim Financing Order to enter the Final Financing Order approving the Loan and the Loan Documents (the "<u>Interim Financing Order</u>") shall have been entered by the Bankruptcy Court, which Interim Financing Order shall not have been vacated, reversed or stayed, or modified or amended, without the prior written consent of Lender. The Interim Financing Order shall provide, among other things, that:  (i) notice of the DIP Motion was provided as required under applicable Bankruptcy Laws; (ii) the Loan Documents with respect to the Initial Advance are approved by the Bankruptcy Court in their present form without revision (except as may be consented to by Lender prior to such approval but without any obligation to do so); (iii) the execution, delivery and performance of this DIP Loan Agreement by the Debtor with respect to the Initial Advance is authorized;  (iv) the Bankruptcy Court shall have found that the Loan Documents constitute valid and enforceable obligations of Debtor and that the payment and performance of the obligations of Debtor under the Loan Documents with respect to the Initial Advance shall constitute (x) an unsecured credit obtained pursuant to Section 364(c)(1) of the Bankruptcy Code, allowable under Section 503(b)(1) of the Bankruptcy Code and having priority over any and all administrative expenses of the kind specified in, or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 726 or any other provisions of the Bankruptcy Code, but not collectible from Avoidance Actions or the proceeds thereof, and (y) a senior secured, super priority loan as set forth herein pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, (v) the Loan Fee and other closing expenses are approved; and (vi) the Initial Advance may be consummated immediately upon the entry of the Interim Financing Order.

(ii)    With respect to the obligation of Lender to make the Second Advance to the Debtor, a final non-appealable order of the Bankruptcy Court in the Bankruptcy Case, in form and substance satisfactory to Lender in its sole and absolute discretion, approving the Loan and the Loan Documents (the "<u>Final Financing Order</u>") shall have been entered by the Bankruptcy Court, which Final Financing Order shall not have been vacated, reversed or stayed, or modified or amended, without the prior written consent of Lender. The Final Financing Order shall provide, among other things, that: (i) notice of the DIP Motion was provided as required under applicable Bankruptcy Laws; (ii) the Loan Documents are approved by the Bankruptcy Court in their present form without revision (except as may be consented to by Lender prior to such approval but without any obligation to do so); (iii) the execution, delivery and performance of this DIP Loan Agreement by the Debtor is authorized; (iv) the Bankruptcy Court shall have found that the Loan Documents constitute valid and enforceable obligations of Debtor and that the payment and performance of the

16

obligations of Debtor under the Loan Documents shall constitute (x) an unsecured credit obtained pursuant to Section 364(c)(1) of the Bankruptcy Code, allowable under Section 503(b)(1) of the Bankruptcy Code and having priority over any and all administrative expenses of the kind specified in, or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 726 or any other provisions of the Bankruptcy Code, but not collectible from Avoidance Actions or the proceeds thereof, and (y) a senior secured, super priority loan as set forth herein pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code; (v) that Debtor shall not be entitled to seek other or further financing under Sections 364(b), (c), or (d) of the Bankruptcy Code, whether having priority, subordinated, unsecured or secured, unless either (A) the payment and performance Obligations to Lender under the Loan Documents have been paid and performed in full or (B) Lender has consented thereto in writing (but without any obligation to do so); (vi) the validity, enforceability and priority of the payment and performance obligations to Lender by Debtor with respect to the Loan and the Loan Documents shall not be impaired or otherwise adversely affected in any manner; (vii) the Bankruptcy Court's finding that Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code as Lender has negotiated in good faith with Debtor and has entered into the Loan Documents and has extended credit hereunder in good faith; (viii) the Loan Fee and other closing expenses are approved; and (ix) the Initial Advance may be consummated immediately upon the entry of the Interim Financing Order and the Second Advance may be consummated immediately upon entry of the Final Financing Order unless an order of stay is entered prior to any such Initial Advance or Second Advance is consummated.

(e)     Automatic Stay.  The automatic stay of Section 362 of the Bankruptcy Code shall have been modified, amended, annulled and terminated: (i) to permit the creation and perfection of Lender's Liens and security interests, as more fully set forth in the Financing Orders and (ii) to permit Lender's enforcement of all rights and remedies granted to Lender under the Loan Documents, the Financing Orders and applicable state and federal law, including without limitation the exercise of any prejudgment remedies by Lender and foreclosure by Lender under the Loan Documents upon an Event of Default under the Loan Documents, all without further order of the Bankruptcy Court.

(f)     Required Documentation.  Lender shall have received the following supporting documents with respect to Debtor: (i) a copy of its articles of organization certified as of a date reasonably close to the Closing Date to be a true and accurate copy by the Secretary of State of Colorado, (ii) a certificate of the Secretary of State of Colorado, dated as of a date reasonably close to the Closing Date, as to its existence and (if available) good standing, (iii) a certificate of the Secretary of State of California, dated as of a date reasonably close to the Closing Date, as to its foreign qualification and (if available) good standing, (iv) a copy of its operating agreement (as applicable), certified by its secretary or assistant secretary, manager or other appropriate Person (as applicable) to be a true and accurate copy of its operating agreement (as applicable) in effect on the Closing Date (except as otherwise provided below), (v) a copy of resolutions of its members or manager or similar governing body, as applicable certified to be true and correct copies thereof duly adopted, approved or otherwise delivered by such members or manager or similar governing body (to the extent necessary and applicable), each of which is certified to be in full force and

17

effect on the Closing Date, authorizing the execution and delivery by it of the Loan Documents delivered on the Closing Date to which it is a party and the performance by it of all its obligations thereunder, and (vi) such additional supporting documents and other information with respect to its operations and affairs as Lender may reasonably request.

(g)    USA Patriot Act.  Such information on the principals of the Debtor as Lender believes is prudent to ensure compliance with the USA Patriot Act (Title III of Pub. L. 107-56) (signed into law October 26, 2001).   Lender hereby notifies Debtor that, pursuant to the requirements of the Act, it is required to obtain, verify and record the name and address of Debtor and other information that will allow Lender to identify Debtor in accordance with the Act..

(h)    Budget. Debtor shall have delivered to Lender a budget setting forth Debtor's anticipated operating costs with respect to Debtor's business (the "Budget"), which Budget shall be in form and content acceptable to Lender and for a time period acceptable to Lender, each in Lender's sole and absolute discretion, and approved in writing by Lender.

6.    Representations and Warranties.  Borrower hereby represents and warrants to Lender that:

(a)    Existence.  Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of their organization.

(b)    Power and Authority.  Borrower has (i) the power and authority and (ii) all governmental licenses, authorizations, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under the Loan Documents.

(c)    No Conflict.  The execution, delivery and performance by Borrower of the Loan Documents has been duly authorized by all necessary action and does not and will not (i) contravene the terms of any of Borrower's organizational documents, (ii) violate, conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any indenture, agreement and other instrument binding upon it or its property the effect of which has not been stayed by the automatic stay or the Bankruptcy Court or (iii) violate or conflict with any law, regulation or order of any Governmental Authority applicable to it or its property.

(d)    Governmental Authorization.  Other than the entry of the Financing Orders by the Bankruptcy Court, no approval, consent, exemption, or authorization of, or other action by, or notice to, or filing, declaration, recording or registration with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Borrower of this DIP Loan Agreement.

(e)    Due Execution; Binding Effect.  The Loan Documents have been (or upon execution and delivery will be) duly executed and delivered by Borrower.  Subject to the entry of the Financing Orders by the Bankruptcy Court, the Loan Documents constitutes the legal, valid and binding obligation of Borrower, enforceable against Borrower, jointly and severally, in accordance with its terms.

(f)    <u>No Default</u>.  No Default or Event of Default has occurred and is continuing.

(g)    <u>Lawsuits</u>.  There is no lawsuit, tax claim or other dispute pending or threatened against Borrower which, if lost, would impair in any material respect the Borrower's financial condition or ability to repay the Loan, except as disclosed to Lender in writing which will be set forth in the Borrower's schedules and statement of financial affairs to be filed on the Bankruptcy Court docket in the Chapter 11 Case.

(h)    <u>Regulatory Compliance</u>.  Borrower is in compliance in all material respects with all applicable laws and regulations of applicable Governmental Authorities, which are required for Borrower to operate its business.

(i)    <u>Ownership Interests</u>.  There are no existing pledges of any direct or indirect ownership interests in Borrower to anyone other than Lender.  Apollo Development, LLC owns directly or indirectly 74.50% and The HMW Group, Ltd., LLC owns directly or indirectly 25.50% of the ownership interests in Borrower free and clear of any security interest, restriction, third-party rights, and other encumbrances other than the rights of Lender.  Borrower has delivered to Lender true, correct and complete copies of the current articles of organization, operating agreement, incumbency certificate, certificate of good standing and resolutions of Borrower.

(j)    <u>Borrower Not a "Foreign Person"</u>.  Borrower is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended from time to time.

(k)    <u>Disclosure</u>.  To the best information and knowledge of Borrower, no representation or warranty by Borrower in the Loan Documents and no certificate, schedule, exhibit, report or other document provided or to be provided by Borrower in connection with the transactions contemplated hereby or thereby (including, without limitation, the negotiation of and compliance with the Loan Documents) contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

7.    <u>Covenants</u>.  Borrower hereby covenants and agrees that from the date hereof until payment in full of all the Obligations that:

(a)    <u>Additional Information</u>.  Borrower shall, upon ten (10) Business Days' written notice, provide Lender: (i) true and complete copies of its balance sheet for the current and prior fiscal year, as well as a consolidated statement of cash flows detailing actual cash flows (and budgeted cash flows), which shall be in a form substantially similar to the reports delivered to Lender prior to the date hereof, or such other form or forms reasonably satisfactory to Lender; (ii) true and complete copies of the unaudited, consolidated statement of cash flows detailing actual cash flows (and budgeted cash flows) for the current or prior fiscal year with respect to the Collateral, which shall be in form reasonably satisfactory to Lender and certified by Borrower's manager; (iii) true and complete copies of the monthly operating statements for each component of the Collateral, which shall be in form reasonably satisfactory to Lender and certified by Borrower's chief financial officer; (iv) complete and accurate certified copies of Borrower's income tax return(s); (v) a written statement, duly acknowledged, setting forth the unpaid principal

19

of, and interest on, the indebtedness secured by the Collateral and whether or not any offsets or defenses exist against such principal and interest; and (vi) all additional information concerning the Collateral or Borrower that Lender may reasonably request.

(b)    Notice of Event of Default.   Borrower shall, promptly upon obtaining knowledge thereof, notify Lender of the occurrence or existence of any Default or Event of Default.

(c)    Other Notices.   Borrower shall promptly notify Lender of: (i) any notice that Borrower has failed in any material respect to comply with any applicable law, regulation or court order, (ii) any litigation commenced by or against Borrower or (iii) any material adverse change in Borrower's financial condition or business operations or ability to repay the Loan.

(d)    Existence.   Borrower shall preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of organization.

(e)    Use of Collateral.   Borrower shall not make, suffer or permit any use of the Collateral for any purpose other than exists on the date hereof except as may be approved in writing by Lender.

(f)    Leases or Other Transfers.   Borrower shall not, without the prior written consent of Lender (to be granted or withheld in Lender's sole and absolute discretion), enter into any Lease, modify, surrender, terminate, extend or renew, either orally or in writing, any Lease now existing or hereafter created upon the Collateral or any part thereof, or permit an assignment or sublease thereof without the prior written consent of Lender (to be granted or withheld in Lender's discretion).   Borrower shall not, without the prior written consent of Lender, assign or further encumber or convey or dispose (or permit or consent or agree to the conveyance, encumbrance or disposal) of any interest in the Collateral, and any assignment or encumbrance, or purported assignment or encumbrance, conveyance, or disposal of any of the foregoing shall be void and of no effect for any purpose whatsoever.   Borrower shall not, without the prior written consent of Lender, assign or further encumber or convey or dispose (or permit or consent or agree to the conveyance, encumbrance, or purported assignment or encumbrance, or disposal) of any interest in any other permit, license or authorization issued with respect to the Collateral or any portion thereof, by the applicable Governmental Authority having jurisdiction thereover, and in each case any of the foregoing shall be void and of no effect for any purpose whatsoever.

(g)    Covenants, Conditions and Restrictions.   Borrower shall not record (or cause or allow to be recorded) any covenants, conditions, restrictions, declarations, or any other agreement or instrument with respect to any portion of the Collateral, without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed.   If applicable, Lender may, in the reasonable exercise of its discretion, require that Borrower execute and deliver to Lender an assignment of the declarant's rights together with such other security agreements, financing statements and instruments as Lender may require which have the effect of creating a collateral assignment of Borrower's interest as declarant, all in a form acceptable to Lender.

(h)    Other Agreements Affecting the Collateral.   Borrower shall neither enter into any written agreement or amend or modify, in any material respect, any REA or any other easements,

20

covenants, or conditions affecting all or any portion of the Collateral without Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

(i)    <u>Compliance with Laws</u>.  Borrower will comply in all material respects with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property.

(j)    <u>Hazardous Materials</u>.

(i)    <u>Special Representations and Warranties</u>.  Without in any way limiting the other representations and warranties set forth in this DIP Loan Agreement, and after reasonable investigation and inquiry, Debtor hereby represents and warrants to the best of its knowledge as of the date of this DIP Loan Agreement as follows:

(A)    <u>Hazardous Materials</u>.  The Collateral is not and has not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any oil, flammable explosives, asbestos, urea formaldehyde insulation, polychlorinated biphenyls, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials, including, without limitation, any substances which are "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under the Hazardous Materials Laws, as described below, and/or other applicable environmental laws, ordinances, or regulations (collectively, the "<u>Hazardous Materials</u>") in material violation of all applicable Hazardous Materials Laws.

(B)    <u>Hazardous Materials Laws</u>.  The Collateral is in compliance with all laws, ordinances, and regulations relating to Hazardous Materials and with any permit, license, or requirement pertaining to the protection, preservation, conservation, or regulation of the environment which relates to the Property ("<u>Hazardous Materials Laws</u>"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other jurisdictions or orders and regulations.

(C)    <u>Hazardous Materials Claims</u>.  There are no claims or actions ("<u>Hazardous Materials Claims</u>") pending or, to the knowledge of Debtor, threatened, nor have there been any such claims or actions in the past, against Borrower or the Collateral by any governmental entity or agency or by any other

21

person or entity relating to Hazardous Materials or pursuant to the Hazardous Materials Laws.

(D)     <u>Storage Tanks</u>.   No storage tanks (including, without limitation, petroleum or heating oil storage tanks), underground or above-ground, are present on or under the Collateral.

(E)     <u>Waters of the United States</u>.   No part of the Collateral contains "waters of the United States", as defined in 33 CFR 328.  No Debtor shall discharge dredged or fill material into waters of the United States as such activity is described and regulated by Section 404 of the Clean Water Act, 33 U.S.C. 1344.

(ii)     <u>Covenants</u>.  Borrower agrees as follows:

(A)     <u>No Hazardous Activities</u>.  Except in its ordinary course of business and in compliance with all Hazardous Materials Laws, Borrower shall not cause or permit the Collateral or any Improvements to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation, or presence of any Hazardous Materials, other than products and materials of a type commonly used or otherwise present in residential properties, in quantities and in a manner that complies with Hazardous Materials Laws ("<u>Common Materials</u>").

(B)     <u>Compliance</u>.  Borrower shall comply and cause the Collateral and the Improvements to comply with all Hazardous Materials Laws.

(C)     <u>Notices</u>.  Borrower shall immediately notify Lender in writing of: (i) the discovery of any Hazardous Materials on, under, or about the Collateral or Improvements, other than Common Materials; (ii) any knowledge by Debtor that the Collateral or Improvements do not comply with any Hazardous Materials Laws; and (iii) any Hazardous Materials Claims.  Borrower shall promptly cure and have dismissed with prejudice all Hazardous Materials Claims pursuant to applicable law, and Debtor shall keep the Collateral free of any encumbrance arising from any judgment, liability, or lien imposed pursuant to any Hazardous Materials Claims. Notwithstanding the foregoing sentence, Borrower may, diligently, in good faith and by appropriate legal proceedings, contest any such Hazardous Materials Claims provided (i) Borrower first furnishes to Lender such deposits or other collateral as Lender, in its reasonable discretion, deems sufficient to fully protect Lender's interests, (ii) such contest shall have the effect of preventing any threatened or pending sale or forfeiture of all or any portion of the Collateral or the loss or impairment of Lender's lien and security interests in and to the Collateral and (iii) such contest will not cause Lender to incur any liability, in Lender's sole judgment. Borrower shall permit Lender, at Lender's option, to appear in and to be represented in any such contest and shall pay upon demand all expenses incurred by Lender in so doing, including, without limitation, attorneys' fees and expenses.

22

(D)    <u>Remedial Action</u>.  In response to the presence of any Hazardous Materials on, under, or about the Collateral or Improvements, Borrower shall immediately take, at Debtor's sole expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement, or compromise in respect to any Hazardous Materials Claims.

(E)    <u>Exceptions</u>.  The obligations of Borrower set forth in this Section shall not be applicable to any noncompliance with the terms and conditions hereof to the extent resulting directly from the actions of Lender after Lender acquires title or actual possession to the Collateral pursuant to a foreclosure.

(iii)    <u>Inspection by Lender</u>.  Borrower shall provide such information and certifications as Lender may reasonably request from time to time (whether before or after the commencement of a nonjudicial or judicial foreclosure proceeding) to monitor Borrower's compliance with this Section for the sole purpose of protecting Lender's interest in the Collateral and Improvements.  To protect its interest in the Collateral and Improvements, Lender shall have the right, but not the obligation, at any time upon reasonable prior notice to Borrower, to enter upon the Property, take samples, review Borrower's books and records, interview Borrower's employees and officers, and conduct such other activities as Lender, in its reasonable discretion, deems appropriate, provided that Lender shall take reasonable actions to minimize disruption of Borrower's business at the Collateral.  Borrower shall cooperate fully in the conduct of such an audit.  If Lender decides to conduct such an audit because of (i) a Hazardous Material Claim, (ii) the possibility that Lender may take possession of or title to the Collateral (or any part thereof) after an Event of Default, (iii) a material change in the use of the Collateral which, in Lender's reasonable judgment, increases the risk to its interest in the Collateral and Improvements, or, (iv) the introduction of Hazardous Material to the Collateral, then Borrower shall pay upon demand all reasonable costs and expenses connected with such audit, as determined by Lender in its reasonable discretion, which, until paid, shall become additional indebtedness under the Note secured by the Loan Documents.  Nothing in this Section shall give or be construed as giving Lender the right to direct or control Borrower's actions in complying with Hazardous Materials Laws.

(iv)    <u>Lender's Right to Rely</u>.  Lender is entitled to rely upon Borrower's representations, covenants, agreements and warranties contained in this Section despite any independent investigations by Lender or its consultants or other representatives.  Debtor shall take all necessary actions to determine for themselves, and to remain aware of, the environmental condition of the Collateral.  Borrower shall have no right to rely upon any independent environmental investigations or findings made by Lender or its consultants or other representatives unless otherwise stated in writing therein and agreed to in writing by Lender.

(v)    <u>Hazardous Materials Indemnity</u>.  Borrower hereby agrees to defend, indemnify and hold harmless Lender, its directors, officers, employees, agents, successors and assigns (including, without limitation, any participants in the Loan) from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or

23

other expenses (including, without limitation, attorney's fees and expenses) which Lender may incur as a direct or indirect consequence of (a) any Hazardous Material Claim, (b) any misrepresentation, inaccuracy or breach of any representation, warranty or covenant contained or referred to in this Section, or (c) the use, generation, manufacture, storage, disposal, threatened disposal, transportation or presence of Hazardous Materials in, on, under or about the Collateral or Improvements (collectively, the "Hazardous Indemnified Matters"). The Hazardous Indemnified Matters shall include, without limitation: (i) the reasonable costs, whether foreseeable or unforeseeable, of any repair, cleanup or detoxification of the Collateral which is required by any governmental entity or is otherwise necessary to render the Collateral in compliance with all laws and regulations pertaining to Hazardous Materials; (ii) all other direct or indirect consequential damages (including, without limitation, any third party tort claims or governmental claims, fines or penalties against Lender, any corporation controlled by Lender, or any of their respective directors, officers, employees, agents, successors or assigns); and (iii) all court costs and reasonable attorneys' fees and expenses paid or incurred by Lender, any entity controlled by Lender, or any of their respective directors, officers, employees, agents, successors or assigns relating to the subject matter hereof. Borrower shall immediately pay to Lender upon demand any amounts owing under this indemnity, together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note. Borrower r's duty and obligations to defend, indemnify and hold harmless Lender shall survive the cancellation of the Note and the release, reconveyance or partial reconveyance of the Liens granted pursuant to the Loan Documents. Notwithstanding anything contained herein to the contrary, the above indemnities shall not apply to the extent that a matter results solely and directly from the actions of Lender and first arises after the date that actual possession or title to the Collateral is taken by Lender, Lender's nominee or a successful bidder at a foreclosure sale.

(k)     Use of Proceeds.  Borrower shall not be permitted to use proceeds of the Loan (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the amount, validity, perfection, priority, extent or enforceability of, or to assert any defense, counterclaims or offset to, the Liens granted pursuant thereto, the Obligations or the Liens and security interests of Lender on or in the Collateral, (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation against Lender or (iii) to make any Restricted Payment.

(l)     Liens; No Other Debt.  Borrower shall not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it.  Borrower shall not incur or obtain any other financing or debt except in a manner consistent with the Budget approved by Lender in Lender's sole discretion.

(m)     Title. Borrower have good title to, rights in, and the power to transfer each item of the Collateral upon which they purport to grant a Lien hereunder and under the other Loan Documents, free and clear of any and all Liens except the Encumbrances; (ii) the security interest granted herein and in the other Loan Documents constitutes a valid, first-priority perfected security interest in the presently-existing Collateral, and will constitute a valid, first-priority perfected security interest in Collateral acquired after the date hereof; and (iii) no financing statement or

24

other public notice authorized by Borrower with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Liens permitted by the Loan Documents.  Set forth on Exhibit B is a true, complete, and correct list of all: (i) Borrower's locations where personal property Collateral is maintained, (ii) Borrower's deposit accounts and securities accounts and (iii) Borrower's U.S. federally registered Intellectual Property.

(n)    Restricted Payments.  Borrower shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment.

(o)    Dispositions.  Borrower shall not sell, lease, transfer, assign or otherwise dispose of any of Collateral without the prior written consent of Lender.  Borrower acknowledges that any Collateral that is the subject of any sale, lease transfer or assignment that does not receive such written consent shall continue to be subject to all Liens of Lender for the benefit of Lender.

(p)    Budget.  Except as otherwise provided herein or approved by Lender in his sole and absolute discretion, Debtor will not directly or indirectly (a) use the proceeds of the Loan in a manner or for a purpose other than those materially consistent with this DIP Loan Agreement, the Loan Documents, the Interim Financing Order, the Final Financing Order and the Budget.

(q)    Further Assurances.

(i)    Promptly upon request by Lender, Borrower shall take such additional actions and execute such documents as Lender may reasonably require from time to time in order (i) to carry out more effectively the purposes of this DIP Loan Agreement, (ii) to subject the Liens created by the Loan Documents or the Financing Orders to any of the properties, rights or interests covered by the Loan Documents or the Financing Orders, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Liens intended to be created by the Loan Documents or the Financing Orders, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to Lender the rights granted or now or hereafter intended to be granted to Lender under the Loan Documents or the Financing Orders.  Any expenses of Lender incurred pursuant to this Section 7(p) shall constitute Obligations under this DIP Loan Agreement.

(ii)    Without limiting Section 7(p)(i) above, Borrower shall execute and deliver to Lender security agreements, pledge agreements, control agreements or any such other documents, instruments or agreements as Lender shall reasonably request to further evidence the Liens and security interests in respect of the Collateral.  All of the documents delivered pursuant to this Section 7(p)(ii) shall be in form and substance reasonably satisfactory to Lender in its sole and absolute discretion.

(iii)    Borrower hereby authorizes Lender to prepare and file and/or record UCC-1 financing statements with respect to that portion of the Collateral for which the Liens and security interests secure the Obligations can be perfected by such filing or recordation.

25

8.      Events of Default.   Each of the following events, if it occurs before all the Obligations have been paid in full, shall constitute an "Event of Default":

(a)      Payment Default.   Failure of Debtor to pay: (i) any interest or principal as and when due under the Loan Documents; (ii) payment of any other fees, costs, expenses or other amounts as and when required pursuant to the Loan Documents, including without limitation, the Exit Fee, or, in the event no time is specified, within five (5) Business Days of written demand by Lender and, in the case of the foregoing clauses (i) & (ii), such default shall continue unremedied for a period of five (5) Business Days after Lender sends a notice of default to the Debtor and lead counsel for the Committee; and (iii) on the Maturity Date, all outstanding amounts due under the Loan Documents, including all outstanding principal, all accrued but unpaid interest and all outstanding fees, costs, expenses and other amounts due under the Loan Documents, including without limitation, the Exit Fee.

(b)      Specified Defaults.   Failure of any Debtor to: (i) perform or observe any term, covenant or agreement contained in Section 7(b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l), (m), (n), (o), (p) or (q), or (ii) perform or observe any other term or covenant contained in the Loan Documents and, in the case of the foregoing clauses (i) & (ii), such default shall continue unremedied for a period of the later of (x) ten (10) Business Days after Lender sends a notice of default to Debtor and counsel for the Committee and (y) the applicable cure period specifically enumerated in this DIP Loan Agreement;

(c)      Failure of Representations and Warranties.   Any representation, warranty or certification by Debtor made herein, in any Loan Document or in any report, certificate, financial or similar statement or other document or instrument furnished in connection with the Loan Documents shall prove to have been incorrect or misleading in any material respect on or as of the date made or deemed made;

(d)      Failure to Obtain Governmental Authority.   Debtor shall have failed to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for Debtor to perform its obligations hereunder in accordance with all applicable laws, rules and regulations;

(e)      Additional Liens.   The recording of any Lien against the Collateral and the continuance of such Lien for ten (10) Business Days without discharge, satisfaction or provision for payment being made by Debtor in a manner satisfactory to Lender; or the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Collateral; or the sequestration or attachment of, or any levy or execution upon any Collateral, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of ten (10) Business Days or the sale of the assets affected thereby;

(f)      Dissolution or Material Management Changes.   The dissolution of Debtor or the occurrence of any material management or organizational change in Debtor, which Lender determines, in its reasonable discretion, has or is reasonably likely to have a material adverse effect on the Loan, the Collateral, or on the ability of Debtor to perform its obligations under the Loan Documents;

26

(g)     Disposition of Collateral.  The Property or any part thereof or any interest therein is sold, conveyed, refinanced, transferred, leased, assigned, exchanged, disposed of (including without limitation, any of the easements benefitting the Property shown on the Title Insurance Policy are lost, transferred, conveyed or terminated such that they no longer benefit the Property), or is further encumbered, or an agreement for any of the foregoing is entered into, except without the prior written consent of Lender.

(h)     Additional Financing.  Debtor enters into any secondary or additional financing agreements or arrangements of any kind that does not fully repay the Loan;

(i)     Taxes and Insurance.  Debtor fails to pay real estate or personal property taxes or insurance invoices as and when due;

(j)     Zoning.  The Collateral is rezoned (except for such rezoning as may be specifically approved in advance by Lender), either voluntarily or involuntarily, or any agreement for the foregoing is entered into, without the prior written consent of Lender;

(k)     Material Adverse Change.  There occurs, in the reasonable opinion of Lender, a material adverse change in the financial condition of Debtor;

(l)     Judgments.  If a judgment or judgments (i) for the payment of money in an amount, individually or in the aggregate, of One Hundred Thousand Dollars ($100,000.00) or more (to the extent not covered by independent third-party insurance), or (ii) which individually or in the aggregate could reasonably be expected to result in a material adverse change, shall be rendered against Debtor and shall remain unsatisfied and unstayed for a period of thirty (30) days or more;

(m)     Change of Control.  The occurrence of any Change of Control.

(n)     Bankruptcy Specific Defaults.  The occurrence of any of the following in the Chapter 11 Case:

(i)     the Bankruptcy Case is not commenced on or before April 21, 2021;

(ii)     the Interim Financing Order shall not have been entered by the Bankruptcy Court on or before April 28, 2021, or the earliest date thereafter that the Bankruptcy Court's calendar permits or such later date as consented to in writing by Lender in its sole and absolute discretion (or, if so entered, shall be subject to stay pending appeal of such date) or at any time ceases to be in full force and effect;

(iii)     the Final Financing Order shall not have been entered by the Bankruptcy Court on or before May 20, 2021, or the earliest date thereafter that the Bankruptcy Court's calendar permits or such later date as consented to in writing by Lender in its sole and absolute discretion (or, if so entered, shall be subject to stay pending appeal of such date) or at any time ceases to be in full force and effect;

27

(iv)    the entry of an order amending, supplementing, staying, vacating, reversing or otherwise modifying this DIP Loan Agreement, the other Loan Documents, the Interim Financing Order or the Final Financing Order without the written consent of Lender;

(v)    the appointment in the Chapter 11 Case of an interim or permanent trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of Debtor (beyond those expressly set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code);

(vi)    the dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(vii)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral with respect to assets of any Debtor exceeding Fifty Thousand and No/100 Dollars ($50,000.00) in value; or (y) to permit the perfection of any Lien on the Collateral;

(viii)    the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under the Loan Documents;

(ix)    the entry of an order granting any administrative claim or Lien (including adequate protection Liens) which are equal or superior to that provided to Lender;

(x)    the filing of any pleading by any Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clauses (iv), (v), (vi), (vii), (viii) or (ix) of this Section 8(n);

(xi)    any violation of the Interim Financing Order or the Final Financing Order;

(xii)    the termination or lapse of any Debtor's "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization without the prior written consent of Lender;

(xiii)    Debtor, the Committee or any other creditor or party in interest proposes a plan of reorganization that seeks to vary, amend, modify or change in any respect the terms, covenants and conditions of this DIP Loan Agreement, the other Loan Documents or the Financing Order without the prior written consent of Lender, which consent may be given or withheld in Lender's sole and absolute discretion;

(xiv)    the filing by Debtor of any motion or proceeding, or the entry of an order by the Bankruptcy Court, which could reasonably be expected to result in material impairment of Lender's Collateral or Lender's rights under the Loan Documents, the Interim Financing Order or the Final Financing Order;

(xv)    Debtor seeks to sell any of its assets outside of the ordinary course of business without the written consent of Lender;

28

(xvi)   Debtor (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the Loan Document or the Liens on or security interests in the assets of Debtor securing the Obligations or (B) commences any actions or proceedings against Lender;

(xvii)   Debtor files or commences any proceeding to surcharge Lender pursuant to Sections 105, 364 or 506(c) of the Bankruptcy Code;

(xviii)  the allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

(xix)   the Committee commences any actions or proceedings against Lender;

(xx)   Debtor or the Committee moves the Bankruptcy Court to enter, modify or amend any Financing Order without the prior written consent of Lender to the form and substance of the proposed order;

(xxi)   the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto that does not fully repay the Obligations, the form and substance of which is not consented to in writing by Lender; or

(xxii)   the Bankruptcy Court enters an order granting relief from the automatic stay to any Person asserting a claim or other right against the Collateral unless otherwise consented to in writing by Lender.

9.    Notice of Default.  Lender shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless Lender shall have received written notice from Debtor referring to this DIP Loan Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."

10.    Remedies.

(a)    Certain Actions Following a Default.  Upon the occurrence of an Event of Default, automatically and without further notice by or action of Lender or any other person, and without the necessity of notice to, the consent of or approval of the Bankruptcy Court or any other person: (i) the outstanding balance of the Loan, including all outstanding principal, accrued but unpaid interest and all other Obligations required to be paid under the Loan Documents, shall become immediately due and payable in full, with interest accruing thereon at the Default Rate at all times thereafter until paid in full, (ii) Lender may apply all amounts received by Lender in such order and manner as Lender may determine in its sole and absolute discretion, and (iii) Lender may exercise, without further order of the Bankruptcy Court, any rights and remedies provided to Lender under the Loan Documents, applicable federal, state and local law, or in equity, including without limitation, foreclosure on the Collateral.

(b)    Lender's Fees and Expenses.  In case of any Event of Default hereunder, Debtor shall pay Lender's fees and expenses including, without limitation, attorneys' fees and expenses,

29

in connection with the enforcement of this DIP Loan Agreement or any of the other Loan Documents.

(c)     Cumulative Remedies.  To the extent not prohibited by the provisions of applicable law which cannot be waived, all of Lender's rights hereunder and under any other Loan Document between Lender and Debtor shall be cumulative.  No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(d)     Waivers.  To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, Debtor hereby waives (i) all presentments, demands for performance, notices of nonperformance (except to the extent required by this DIP Loan Agreement), protests, notices of protest and notices of dishonor; (ii) any requirement of diligence or promptness on the part of Lender in the enforcement of its rights under the Loan Documents; (iii) any and all notices of every kind and description which may be required to be given by any statute or rule of law and (iv) any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under the Loan Documents.

(e)     Protective Advances.  If an Event of Default occurs or if Lender determines, in its sole and absolute discretion, that advances are required in order to protect or preserve the Collateral or Lender's interest therein, Lender may (but shall in no event be required to) cure any such Event of Default and/or make any such advances and any amounts expended by Lender in so doing, as determined by Lender in its sole and absolute discretion, shall (i) be deemed advanced by Lender under an obligation to do so regardless of the identity of the Person to whom such funds are furnished, (ii) constitute additional advances hereunder, the payment of which is additional indebtedness evidenced by the Note, and (iii) become due and owing, at Lender's demand, with interest accruing from the date of disbursement thereof until fully paid at the Default Rate.

(f)     Power of Attorney.  Exercisable only upon the occurrence and during the continuance of an Event of Default, immediately upon receiving written notice from Lender of its intent to exercise its rights pursuant to this Section, Debtor hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as its true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b)  receive and open all mail addressed to Debtor for the purpose of collecting the Accounts; (c) notify all account debtors with respect to the Accounts to pay Lender directly; (d) endorse Debtor's name on any checks or other forms of payment or security that may come into Lender's possession; (e) sign Debtor's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (f) make, settle, and adjust all claims under and decisions with respect to Debtor's policies of insurance; (g) demand, collect, receive, sue, and give releases to any account debtor for the monies due or which may become due upon or with respect to the Accounts and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Accounts; (h) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; (i) sell,

30

assign, transfer, pledge, compromise, discharge or otherwise dispose of any Collateral; (j) execute on behalf of Debtor any and all instruments, documents, financing statements and the like to perfect Lender's interests in the Accounts and collections and file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral; and (k) do all acts and things necessary or expedient, in furtherance of any such purposes.  The appointment of Lender as Debtor'' attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

(g)    <u>Accounts Collection</u>.  During the continuation of an Event of Default, Debtor shall collect all amounts owing to Debtor for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtors, with proper endorsements for deposit.

(h)    <u>No Lender Liability</u>.  To the extent permitted by law, Lender shall have no liability for any loss, damage, injury, cost or expense resulting from any action or omission by it, or any of its representatives, which was taken, omitted or made in good faith.

11.    <u>Indemnification and Expenses</u>.

(a)    <u>Indemnification</u>.  Debtor agrees to indemnify and hold and save harmless Lender and its respective directors, officers, members, managers, employees, agents, attorneys, consultants, advisors, or representatives (collectively, "<u>Indemnitees</u>") from and against any and all losses, damages, claims, actions, demands, liabilities or expenses of any kind whatsoever (including reasonable attorneys' fees and disbursements) incurred by or asserted or awarded against any Indemnitee (including in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith) arising in any way directly or indirectly out of or based upon, in whole or in part, the Loan, the Loan Documents, the Obligations, the Liens, or the negotiation, formulation, preparation, effectuation, performance or enforcement of any of the Loan Documents or any other acts or omissions by any or all of the Indemnitees in connection therewith, except such as may be caused by the gross negligence or willful misconduct of the applicable Indemnitee.  The foregoing indemnity shall be effective whether or not such any such investigation, litigation, or other proceeding to which the indemnity applies is brought by Debtor, any of its respective managers, security holders, creditors, or any other Person and whether or not an Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

(b)    <u>Expenses</u>.  From and after the occurrence of an Event of Default, Debtor agrees to pay all out-of-pocket expenses of Lender (including reasonable documented fees, costs and expenses of legal counsel, financial advisors and other third-party appraisers, advisors and consultants advising Lender) in connection with such Event of Default including the enforcement of any provision of the Loan Documents.  Such expenses shall be added to, and become a part of, the Obligations.  This <u>Section 11(b)</u> shall survive termination of this DIP Loan Agreement.

31

12.    <u>Miscellaneous</u>.

(a)    <u>Marshalling, Waiver of 506(c) Claims and Waiver of Equities</u>.  Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, and all proceeds thereof shall be received and used in accordance with the Financing Orders.  Lender shall (i) be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equity of the case" exception under Section 552(b) shall not apply to Lender with respect to proceeds, products, offspring, or profits of any of the Collateral, and (ii) not be subject to any surcharge claim under Sections 506(c) or 105(a) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by Lender upon the Collateral or and no costs or expenses of administration that have been or may be incurred in the Chapter 11 Case at any time shall be charged against Lender or any of its claims or Liens, and Debtor hereby irrevocably waives any such claims.

(b)    <u>Notices</u>.  Any communication, notice or demand required or permitted to be given hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier at the address or telecopier number set forth below.  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).

| | |
|---|---|
| If to Borrower/Debtor: | Orcutt Rancho LLC<br>1420 South Filbert Way<br>Denver, CO 80222<br>Attn: Gary Greenberg<br>Telephone: (720) 300-4299<br>Fax: _____ |
| With a copy to: | Orcutt Rancho LLC<br>209 W. Alamar Avenue<br>Santa Barbara, CA 93105-3701<br>Attn: Michael O'Flynn<br>Telephone: (805) 448-8962 |
| | And |
| | Fox Rothschild LLP<br>One Summerlin<br>1980 Festival Plaza Drive, Suite 700<br>Las Vegas, Nevada 89135<br>Attn: Brett Axelrod, Esq.<br>Telephone: (702) 699-5901<br>Fax: (702) 597-5503 |

32

If to Lender:                    Santa Maria DIP LLC
                                 c/o JDI Loans LLC
                                 853 N. Elston
                                 Chicago, Illinois 60642
                                 Attn: Bennet Schwartz
                                 Telephone: (312) 433-0500
                                 Fax: (312) 433-0555


With a copy to:                  Garman Turner Gordon LLP
                                 7251 Amigo Street, Suite 210
                                 Las Vegas, Nevada 89119
                                 Attn: Talitha Gray Kozlowski, Esq.
                                 Telephone: (725) 777-3000
                                 Fax: (725) 777-3112

     (c)    <u>Entire DIP Loan Agreement; Severability</u>.  This DIP Loan Agreement sets forth the parties' entire agreement and understanding in respect of the subject matter contained herein. Notwithstanding the foregoing, however, the Financing Orders shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent inconsistent with, or address matters not addressed in, this DIP Loan Agreement.  If any term or provision hereof, or its application to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this DIP Loan Agreement, or the application of such terms to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term hereof shall be valid and enforceable to the fullest extent permitted by applicable law.

     (d)    <u>Assignment</u>.  Neither this DIP Loan Agreement nor any of the rights, interests or obligations of Debtor hereunder shall be assigned or otherwise transferred by Debtor, nor may Debtor delegate performance hereunder, except with Lender's prior written consent.  Lender shall be permitted to assign any rights and obligations hereunder to any affiliate of such Lender.

     (e)    <u>Reliance by Lender</u>.  Lender shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, or telephone message, statement, or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to Debtor), independent accountants, and other experts.

     (f)    <u>APPLICABLE LAW</u>.    THIS DIP LOAN AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES

BETWEEN ANY LENDER AND DEBTOR PERTAINING TO THIS DIP LOAN AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS DIP LOAN AGREEMENT; <u>PROVIDED</u>, THAT LENDER AND DEBTOR ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED FURTHER</u>, THAT NOTHING IN THIS DIP LOAN AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ANY COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.

(g)    <u>WAIVER OF VENUE</u>.    EACH DEBTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS DIP LOAN AGREEMENT IN ANY COURT REFERRED TO IN <u>SECTION 12(f)</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(h)    <u>SERVICE OF PROCESS</u>.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 12(a)</u>.  NOTHING IN THIS DIP LOAN AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(i)    <u>WAIVER OF JURY TRIAL</u>.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS DIP LOAN AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(j)    <u>Counterparts</u>.  This DIP Loan Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same DIP Loan Agreement.  A facsimile copy of a signature hereto shall have the same effect as the original of such signature.

(k)    <u>Reinstatement</u>.  If any payment hereunder, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(l)    <u>Binding DIP Loan Agreement</u>.  Upon the entry of the Interim Financing Order, this DIP Loan Agreement shall be binding upon Debtor, the estate of Debtor and any trustee or

successor in interest of Debtor in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. Upon the entry of the Interim Financing Order, this DIP Loan Agreement shall be binding upon, and inure to the benefit of, the successors of Lender and its assigns, transferees and endorsees. Notwithstanding the foregoing, it is acknowledged and agreed by Debtor and Lender that Debtor's obligation to pay the Initial Fee as provided in the Loan commitment letter from Lender to Debtor dated April 14, 2021 and paid by Debtor prior to commencement of the Chapter 11 Case is not conditioned on the entry of any Financing Order, was fully earned and non-refundable upon receipt by Lender, and the terms and provisions relating to the Initial Fee shall be binding on the parties as of the date of such Loan commitment letter. The claims and any Liens that may be created by the Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect any security interests or Liens under applicable law.

13.     <u>Brokers and Financial Advisors</u>.  Except for Conway Mackenzie, Debtor hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this DIP Loan Agreement. Debtor hereby agrees that it shall be responsible for the payment of any brokerage commission payable to Conway Mackenzie pursuant to a separate agreement and that any fee payable to Conway Mackenzie or any other broker in connection with the transactions contemplated by this DIP Loan Agreement shall not be the responsibility of Lender, and Borrower shall indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Debtor or Lender in connection with the transactions contemplated herein. The provisions of this <u>Section 13</u> shall survive the expiration and termination of this DIP Loan Agreement and the payment of the Obligations.

[The remainder of this page is intentionally blank.]

35

**IN WITNESS WHEREOF**, the parties have caused this DIP Loan Agreement to be duly executed as of the date first above written.

<u>**BORROWER/DEBTOR**</u>

**ORCUTT RANCHO LLC**, as Debtor

By:  Apollo Development LLC, its co-managing member

By: _____
Name:  Gary Greenberg
Title:   Managing Member

<u>**LENDER**</u>

**SANTA MARIA DIP LLC**, an Illinois limited liability company

By: _____
Name:  Bennet Schwartz
Title:   Manager

**IN WITNESS WHEREOF**, the parties have caused this DIP Loan Agreement to be duly executed as of the date first above written.

<u>**BORROWER/DEBTOR**</u>

**ORCUTT RANCHO LLC**, as Debtor

By:  Apollo Development LLC, its co-managing member

By: _____

Name:  Gary Greenberg

Title:   Managing Member

<u>**LENDER**</u>

**SANTA MARIA DIP LLC**, an Illinois limited liability company

By: _____

Name:  Bennet Schwartz

Title:   Manager

*Signature Page to
DIP Loan Agreement*

# EXHIBIT A

## DEBTOR'S REAL PROPERTY

Real property in the unincorporated area of the County of Santa Barbara, State of California, described as follows:

PARCEL 1: [APNS: 113-250-015 (PARCEL B) AND 113-250-016 (PARCEL C)]

THAT PORTION OF THE RANCHO PUNTA DE LA LAGUNA, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, SHOWN AS PARCELS B AND C OF THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.  EXCEPTING THEREFROM ALL OIL, GAS AND MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT THE RIGHT TO USE THE SURFACE OF THE REAL PROPERTY HEREINABOVE DESCRIBED OR ANY PORTION OF SAID REAL PROPERTY FROM THE SURFACE THEREON DOWN TO A DEPTH OF 500 FEET BELOW THE SURFACE, FOR THE PURPOSE OF DIGGING, BORING, EXTRACTING, REMOVING AND PRODUCING ALL MINERALS, OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES, AND ANY OTHER RIGHTS THEY MAY NOW HAVE TO ENTER UPON THE SURFACE OF SAID PROPERTY, BUT NOTHING THEREIN CONTAINED SHALL BE DEEMED TO PREVENT SAID GRANTOR, HIS OR HER HEIRS, SUCCESSORS AND ASSIGNS, FROM EXTRACTING AND CAPTURING SAID MINERALS, OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES BY DRILLING ON ADJACENT LANDS OR FROM THOSE CERTAIN PARCELS OF LAND DESCRIBED AS EXCEPTIONS TO THE REAL PROPERTY HEREINABOVE DESCRIBED OR CONDUCTING SUB-SURFACE OR SLAT-WELL DRILLING AT A DEPTH OF 500 FEET OR MORE BELOW THE SURFACE OF SAID REAL PROPERTY FROM ADJOINING LANDS OR FROM THE EXCEPTED PARCELS AFORESAID SO AS NOT TO DISTURB THE SURFACE OF SAID REAL PROPERTY OR ANY IMPROVEMENT THEREON, SAID RIGHTS HAVING BEEN RELINQUISHED BY INSTRUMENTS RECORDED SEPTEMBER 17, 1979 AS INSTRUMENT NO. 79-43153, 79-43154, 79-43155, AND 79-43156 OF OFFICIAL RECORDS.

PARCEL 1A:

AN EASEMENT FOR SEWER LINE PURPOSES IN, ON, OVER, ALONG ACROSS AND UNDER A STRIP OF LAND 20 FEET IN WIDTH, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF THE SUBDIVISIONS OF LOTS 11 AND 12 OF THE DIVISION OF RANCHO PUNTA DE LA LAGUNA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY LINE OF STATE HIGHWAY NO. 1 AS SHOWN ON A MAP FILED IN BOOK 46 PAGE 13 OF RECORD OF SURVEYS, FROM WHICH A 1 INCH IRON PIPE WITH BRASS CAP MARKED R. E. 7487 AS SHOWN ON SAID FILED MAP, BEARS NORTH 69° 55' 03" WEST, 1527.18 FEET;

THENCE ALONG THE CENTERLINE OF 20 FEET SEWER LINE EASEMENT NORTH 20° 40' 57" EAST, 2711.11 FEET TO A POINT IN THE NORTHERLY LINE OF THAT LAND SHOWN ON ABOVE MENTIONED RECORD OF SURVEY, FROM SAID POINT A 2/4 INCH IRON PIPE TAGGED R. E. 2928 BEARS SOUTH 87° 48' 40" EAST, 247.88 FEET.

PARCEL 2: (APN: 113-250-017)

THAT PORTION OF THE RANCHO PUNTA DE LA LAGUNA IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, SHOWN AS PARCEL D OF THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SANTA BARBARA COUNTY. EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND WITHOUT THE RIGHT TO USE THE SURFACE OF THE REAL PROPERTY

HEREINABOVE DESCRIBED OR ANY PORTION OF SAID REAL PROPERTY FROM THE SURFACE THEREON DOWN TO A DEPTH OF 500 FEET BELOW THE SURFACE FOR THE PURPOSE OF DIGGING, BORING, EXTRACTING, REMOVING AND PRODUCING ALL MINERALS, OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES AND ANY OTHER RIGHTS THEY MAY NOW HAVE TO ENTER UPON THE SURFACE OF REAL PROPERTY BUT NOTHING THEREIN CONTAINED SHALL BE DEEMED TO PREVENT SAID GRANTOR, HIS OR HER HEIRS, SUCCESSORS AND ASSIGNS, FROM EXTRACTING AND CAPTURING SAID MINERALS, OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES BY DRILLING ON ADJACENT LANDS OR FROM THOSE CERTAIN PARCELS OF LAND DESCRIBED AS EXCEPTIONS TO THE REAL PROPERTY HEREINABOVE DESCRIBED OR CONDUCTING SUBSURFACE OR SLANT-WELL DRILLING AT A DEPTH OF 500 FEET MORE BELOW THE SURFACE OF SAID REAL PROPERTY FROM ADJOINING LANDS OR FROM THE EXCEPTED PARCELS AFORESAID SO AS NOT TO DISTURB THE SURFACE OF SAID REAL PROPERTY OR ANY IMPROVEMENT THEREON, SAID RIGHTS HAVING BEEN RELINQUISHED BY INSTRUMENTS RECORDED SEPTEMBER 17, 1979 AS INSTRUMENT NOS. 79-43153, 79-43154, 79-43155 AND 79-43156 OF OFFICIAL RECORDS.

PARCEL 2A:

AN EASEMENT FOR SEWER LINE PURPOSES, IN, ON, OVER, ALONG AND ACROSS AND UNDER A STRIP OF LAND 20 FEET IN WIDTH BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEING A PORTION OF THE SUBDIVISIONS OF LOTS 11 AND 12 OF THE DIVISION OF RANCHO PUNTA DE LA LAGUNA, COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY LINE OF STATE HIGHWAY NO. 1, AS SHOWN ON A MAP FILED IN BOOK 46, PAGE 13 OF RECORD OF SURVEYS, FROM WHICH A 1 INCH IRON PIPE WITH BRASS CAP MARKED R.E. 7487 AS SHOWN ON SAID FILED MAP BEARS NORTH 69° 55' 03" WEST 1527.18 FEET; THENCE ALONG THE CENTER LINE OF TWENTY FOOT SEWER LINE EASEMENT NORTH 20° 04' 57" EAST 2711.11 FEET TO A POINT IN THE NORTHERLY LINE OF THAT LAND SHOWN ON ABOVE MENTIONED RECORD OF SURVEY FROM SAID POINT A 2/4 INCH IRON PIPE TAGGED R.E. 2928 BEARS SOUTH 87° 48' 40" EAST, 247.88 FEET.

PARCEL 2B:

NON-EXCLUSIVE EASEMENT FOR EMERGENCY ACCESS AS DESCRIBED IN EASEMENT AGREEMENT (EMERGENCY ACCESS) RECORDED MAY 12, 2014 AS INSTRUMENT NO. 14-21366 OF OFFICIAL RECORDS AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

A STRIP OF LAND, THIRTY (30) FEET WIDE, LYING WITHIN THAT CERTAIN PARCEL OF LAND, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, SHOWN AS PARCEL A ON THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND DESCRIBED AS PARCEL ONE IN THE CORPORATION GRANT DEED RECORDED NOVEMBER 18, 1970 AS INSTRUMENT NUMBER 30863 IN BOOK 2326, PAGE 1023 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF PARCEL D, ON THAT CERTAIN COURSE HAVING A BEARING AND DISTANCE OF S 17° 56' 39" W 173.99, AS SHOWN ON THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS;

THENCE 1ST, S 70° 39' 47" E, A DISTANCE OF 19.33 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE LEFT, CONCAVE NORTHERLY, HAVING A RADIUS OF 100.00 FEET;

THENCE 2ND, ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 27° 05' 30", AN ARC LENGTH OF 47.28 FEET;

THENCE 3RD, N 82° 14' 44" E, A DISTANCE OF 104.53 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE LEFT, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 100.00 FEET;

THENCE 4TH, ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 85° 53' 57", AN ARC LENGTH OF 149.92 FEET;

THENCE 5TH, N 3° 39' 14" W, A DISTANCE OF 226.88 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT, CONCAVE EASTERLY, HAVING A RADIUS OF 150.00 FEET;

THENCE 6TH, ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 25° 12' 25", AN ARC LENGTH OF 65.99 FEET;

THENCE 7TH, N 21° 33' 11" E, A DISTANCE OF 47.75 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE LEFT, CONCAVE WESTERLY, HAVING A RADIUS OF 150.00 FEET;

THENCE 8TH, ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19° 32' 47", AN ARC LENGTH OF 51.17 FEET;

THENCE 9TH, N 2° 00' 23" E, A DISTANCE OF 681.79 FEET TO A POINT ON THE SOUTHEASTERLY LINE OF PARCEL B, ON THAT CERTAIN COURSE HAVING A BEARING AND DISTANCE OF N 89° 26' 11" W 30.00, AS SHOWN ON THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS.

PARCEL 2C:

NON-EXCLUSIVE EASEMENT FOR ROAD ACCESS, PUBLIC UTILITIES, DRAINAGE, INGRESS AND EGRESS, INCLUDING MOTOR VEHICLE, TO AND FROM AS DESCRIBED IN EASEMENT AGREEMENT (PRIMARY ACCESS) RECORDED MAY 12, 2014 AS INSTRUMENT NO. 14-21367 OF OFFICIAL RECORDS AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

A SIXTY (60) FOOT WIDE STRIP OF LAND LYING WITHIN THAT CERTAIN PARCEL OF LAND, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, SHOWN AS PARCEL A ON THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND DESCRIBED AS PARCEL ONE IN THE CORPORATION GRANT DEED RECORDED NOVEMBER 18, 1970 AS INSTRUMENT NUMBER 30863 IN BOOK 2326, PAGE 1023 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHWESTERLY CORNER OF SAID PARCEL A;

THENCE, N 68° 12' 02" W, ALONG THE NORTHERLY LINE OF SAID PARCEL, A DISTANCE OF 30.03 FEET TO A LINE PARALLEL WITH, AND LYING 30 FEET WESTERLY OF, THE WESTERLY LINE OF SAID PARCEL A;

THENCE, S 24° 23' 54" W, ALONG SAID PARALLEL LINE, A DISTANCE OF 857.25 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE LEFT, CONCAVE NORTHEASTERLY, HAVING A RADIUS OF 199.98 FEET;

THENCE, ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 31° 47' 18", AND ARC LENGTH OF 110.95 FEET, MORE OR LESS, TO A POINT ON SAID WESTERLY LINE OF PARCEL A, BEING THE TRUE POINT OF BEGINNING;

THENCE 1ST, CONTINUING ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 36° 39' 21", AN ARC LENGTH OF 127.94 FEET;

THENCE 2ND, S 44° 02' 45" E, A DISTANCE OF 112.20 FEET TO A POINT ON THE WESTERLY LINE OF PARCEL D AS SHOWN ON THE MAP FILED IN BOOK 80, PAGE 2 OF RECORD OF SURVEYS.

# EXHIBIT B

# PERSONAL PROPERTY COLLATERAL LOCATIONS

<u>Borrower's locations where personal property Collateral is maintained</u>:

None

# DEPOSIT & SECURITIES ACCOUNTS

<u>Borrower's deposit accounts</u>:

WELLS FARGO ACCOUNT #███████9770

<u>Borrower's securities accounts</u>:

None

# INTELLECTUAL PROPERTY

<u>Borrower's U.S. federally registered Intellectual Property</u>:

None

# EXHIBIT C

## DEBTOR'S INSURANCE REQUIREMENTS

(a) All insurance policies referred to herein shall be in form and substance acceptable to Lender.

(b) Lender must receive evidence/certificates of insurance at prior to the Closing Date. Original policies must be provided to Lender as soon as they are available from insurers.

(c) Proof of coverage must be on the following forms: Commercial Property: ACORD 28 (2003/10) – Evidence of Property Insurance evidencing replacement cost coverage of not less than $15,000,000 with respect to the California Residential Property. General Liability: Must be written on ACORD 25 or its equivalent.

(i) Limits of liability coverage shall not be less than: * General Aggregate limit $2,000,000 * Products/Completed Operations $1,000,000 * Personal Injury Limit $1,000,000 * Each Occurrence $1,000,000 * Fire and Medical Expense Included.

(ii) Lender named below must be named as Additional Insured and Certificate holder.

(iii) Provision giving Lender not less than thirty (30) days' notice of cancellation or material notification. Please remove "endeavor to" and "but failure to mail such notice shall impose…representatives" language as it relates to notices.

(iv) Insurance carrier must have a financial rating of A-IX or better in the most current Best's Key Rating Guide.

(v) The property should be identified as the location of operations. (vi) The Debtor should be the named insured or additional insured, as applicable.

(vii) If the insured is a contractor or other than the Debtor, the Debtor should be named as an Additional Insured.

(viii) An original Certificate of Liability Insurance (Acord 25) may be accepted; a binder, or "TBA" or "TBD" policy number may be accepted for not more than thirty (30) days).

(ix) The type of insurance under General Liability should be "Occurrence."

Lender shall be shown as Certificate holder and Additional Insured.

(d) All property policies shall contain a standard mortgagee clause in favor of Lender and shall provide for a thirty (30) days written notice to Lender of any material change or cancellation. Certificates with disclaimers will NOT be accepted.

(e) The Debtor must be the Named Insured.

(f) All required insurance certificates must show Lender as Mortgagee and or Lender's Loss Payee as follows: Santa Maria DIP LLC and its successors and/or assigns 853 N. Elston Chicago, Illinois 60642

(g) The property address must be identified as the insured property.

(h) The insurance documentation must be signed by an authorized representative.

*Specific Requirements*

(a) If the property is in a blanket policy or limit, Lender must receive a schedule of the amount allocated to the Building or Rents or the amounts allocated must be indicated on the certificate.

(b) Coverage must be on an "all risk" (Special Perils), 100% replacement cost basis without deduction for foundations and Footings, and WITHOUT co-insurance. The co-insurance must be waived or an Agreed Amount endorsement must be included and either "No CoInsurance" or "Agreed Amount" must be indicated on the certificate.

(c) Ordinance or Law coverage providing for demolition and increased cost of construction must be provided and indicated on the certificate.

(d) Other coverages such as earthquake, boiler and machinery (which includes the mechanics of the building, such as elevators), and flood will be required when these risks are present.

(e) Rent Loss or Business Income coverage shall be in an amount equal to 100% of the projected annual rents or revenue with a minimum period of indemnity of 12 months, or such greater period as Lender may require. This coverage needs to be written on a Gross Rental Income, Gross Profits or Extended Period of Indemnity form, not on an actual loss sustained basis which may terminate as soon as the premises are tenantable or operational.

# EXHIBIT B

The Neighborhoods " at Rancho Maria Golf Course
" Hidden Canyon Development Creek "

**Proposed Project Recapitalization / JDI**

| Proposed Source of Capital | Total | Initial Advance 4/20/21 - 6/30/21 | Second Advance 7/1/21 - 9/30/22 |
|---|---|---|---|
| **Indicated Loan Amount** | $    2,500,000.00 | $    442,068.00 | $    2,057,932.00 |
| **Cost of capital** | | | |
| Loan fee to JDI DIP lender (3%) at closing | 75,000.00 | 75,000.00 | - |
| Orcutt Rancho paid 04.15.21 | (10,000.00) | (10,000.00) | - |
| Orcutt Rancho reimbursed | 10,000.00 | - | 10,000.00 |
| Legal & Documents estimate    JDI | 22,500.00 | 22,500.00 | - |
| Legal & Documents estimate   Orcutt Rancho | 14,500.00 | - | 14,500.00 |
| Break Up Fee | - | 50,000.00 | (50,000.00) |
| Misc | 1,500.00 | - | 1,500.00 |
| **Subtotal - cost of capital add to emergency funding** | **113,500.00** | **137,500.00** | **(24,000.00)** |
| **Capital available for debt relief** | **2,386,500.00** | **304,568.00** | **2,081,932.00** |
| **Property Taxes** | | | |
| Santa Barbara County Tax Collector (Prior Years Taxes) | 88,352.19 | 75,000.00 | 13,352.19 |
| **subtotal - debt / taxes** | **88,352.19** | **75,000.00** | **13,352.19** |
| **capital available for operations** | **2,298,147.81** | **229,568.00** | **2,068,579.81** |
| **Predevelopment Expenses (Bankruptcy and Entitlement Related)** | | | |
| US Trustee fees | 21,400.00 | | 21,400.00 |
| Romspen Mortgage interest (2.5% 18 mo.) | 225,000.00 | 37,500.00 | 187,500.00 |
| Secondary Asset Protection (Apollo) | 90,000.00 | 15,000.00 | 75,000.00 |
| JDI  interest (12% 18mo. Hold back) | 460,000.00 | 22,000.00 | 438000 |
| Legal Bankruptcy | 405,000.00 | | 405000 |
| Expert Witness fee | 100,000.00 | | 100000 |
| **Subtotal - Bankruptcy Related** | **1,301,400.00** | **74,500.00** | **1,226,900.00** |
| Land Planning (Frances Romero) | 97,000.00 | 18,000.00 | 79,000.00 |
| Land Planning (David Stone) | 12,500.00 | 2,000.00 | 10,500.00 |
| Biological Consultant (TBD) | 108,000.00 | 3,000.00 | 105,000.00 |
| EIR (Rincon) | 50,000.00 | - | 50,000.00 |
| Traffic (Dennis Lammers) | 4,000.00 | - | 4,000.00 |
| Groundwater Consulting (Jordan Kear) | 1,000.00 | - | 1,000.00 |
| Santa Barbara County (Map Processing Costs) | 132,819.03 | 37,408.63 | 95,410.40 |
| Civil Engineering (Bethel) | 51,000.00 | 9,000.00 | 42,000.00 |
| Surveying (Fargen) | 8,500.00 | - | 8,500.00 |
| Public Relations (TBD) | 2,400.00 | - | 2,400.00 |
| Field/Office Supplies (Various) | 750.00 | - | 750.00 |
| Reproductions (Various) | 2,950.00 | 300.00 | 2,650.00 |
| Proprety Taxes (County of Santa Barbara) | 40,843.82 | - | 40,843.82 |
| Legal - Land Use/SB 330 (Cox) | 140,235.00 | 20,610.00 | 119,625.00 |
| Legal- Historical Golf Course Issues (Hollister) | 33,150.00 | 12,750.00 | 20,400.00 |
| Legal - Taking Issue by County(TBD) | 25,000.00 | 7,500.00 | 17,500.00 |
| Accounting/Admin and Proj. Management  (Center Point) | 208,000.00 | 36,000.00 | 172,000.00 |
| Insurance (New Front) | 1,200.00 | - | 1,200.00 |
| Architect (Pascuzzo) | 8,000.00 | 1,000.00 | 7,000.00 |
| Architectural Illustrations (TBD) | 3,500.00 | - | 3,500.00 |
| Landscape Architect (Plenaire) | 8,000.00 | - | 8,000.00 |
| Designer Fees (Dale Martin) | 1,500.00 | - | 1,500.00 |
| Website (TBD) | 2,000.00 | - | 2,000.00 |
| Photography (TBD) | 1,000.00 | - | 1,000.00 |
| Appraisal (Newmark) | 7,500.00 | 7,500.00 | - |
| Contingency (TBD) | 45,899.96 | - | 45,899.96 |
| **Subtotal Entitlement Related** | **996,747.81** | **155,068.63** | **841,679.18** |
| **Predevelopment Total** | **2,298,147.81** | **229,568.63** | **2,068,579.18** |
| **Total Capital Required** | **2,298,147.81** | **229,568.63** | **2,068,579.18** |
| **Capital available ( deficiency )** | $    - | $    (0.63) | $    0.63 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Fox Rothschild, LLP 1980 Festival Plaza Drive, Suite 700, Las Vegas, NV 89135

A true and correct copy of the foregoing document entitled (*specify*):    **FIRST-DAY   DECLARATION   OF   GARY GREENBERG IN SUPPORT OF EMERGENCY FIRST DAY MOTION**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 04/21/2021 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Brett A Axelrod**    baxelrod@foxrothschild.com,
  pchlum@foxrothschild.com;msteen@foxrothschild.com;amwilson@foxrothschild.com
- **Brian D Fittipaldi**    brian.fittipaldi@usdoj.gov
- **United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov

⊠ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 04/22/2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

⊠ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 04/21/2021 | Patricia Chlum | /s/Patricia Chlum |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**Via Electronic Mail Service:**

| | |
|---|---|
| Apollo Development | ggreen2358@gmail.com |
| Bethel Engineering | russ@dbaengineers.com |
| Capital Pacific Dev Group | michaelo@cpdginc.com |
| County of Santa Barbara PD | dalazaer@co.santa-barbara.ca.us |
| County of Santa Barbara Tax | ttcpapg@co.santa-barbara.ca.us |
| Dale Martin | kalikalikalima@yahoo.com |
| David F. Stone | stonearcheo@yahoo.com |
| Dudek | jdavis@dudek.com |
| Garman Turner Gordon | tgray@Gtg.legal |
| | cmurphy@Gtg.legal |
| Hamner Jewell & Assoc. | ljewell@hamner-jewell.com |
| Hollister & Brace | pcandy@hbsb.com |
| Kear Groundwater | accounts@keargroundwater.com |
| Nossaman LLP | dgraeler@nossaman.com |
| | jjaffe@nossaman.com |
| PleinAire Design Group | kjsmall@pleinairedg.com |
| Rancho Maria Golf Club | ashaverdian@nossaman.com |
| Romspen Mortgage | StevenMucha@romspen.com |
| Stantec | Dennis.Lammers@stantec.com |
| TW Land Planning & Development | twhite@twlandplan.com |
| United States Trustee | brian.fittipaldi@usdoj.gov |

121900917.v1

**SERVICE VIA FEDERAL EXPRESS**

Apollo Development, LLC
Attn: Gary Greenberg
1420 S. Filbert Way
Denver, CO 80222

Artin N. Shaverdian
Nossaman LLP
777 South Figueroa, 34th Floor
Los Angeles, CA 90017

Bethel Engineering
Russ Garrison
2624 Airpark Drive
Santa Maria, CA 93455

Capital Pacific Development Group
Attn: Gavin Moores
209 W. Alamar Ave., Ste. A
Santa Barbara, CA 93105

County of Santa Barbara
105 E. Anapamu St., Room 109
Santa Barbara, CA 93101

County of Santa Barbara
Planning and Development
Attn: David Lazaer
123 East Anapamu
Santa Barbara, CA 93101

Dale Martin
181 Seminole Lane
Lake Havasu City, AZ 86404

David F. Stone Planning
27 West Constance Ave.
Santa Barbara, CA 93105

David Graeler
Nossaman LLP
777 South Figueroa, 34th Floor
Los Angeles, CA 90017

121898407.v1

Dudek
Attn: John Davis
605 Third Street
Encinitas, CA 92024

Forma Company
3050 Pullman St.
Costa Mesa, CA 92626

Hamner Jewell & Associates
Attn: Lillian Jewell
530 Paulding Circle, Ste. A
Santa Barbara, CA 93120

Hollister & Brace P.C.
Attn: Peter Candy
1126 Santa Barbara St.
Santa Barbara, CA 93101

Jill N. Jaffee
Nossaman LLP
777 South Figueroa, 34th Floor
Los Angeles, CA 90017

Kear Groundwater
Attn: Jordan Kear
P.O. Box 2601
Santa Barbara, CA 93120

PleinAire Design Group
Attn:  Kevin Small
3203 Lightning St., Suite 201
Santa Maria, CA 93455

Rancho Maria Golf Club
1950 Highway 1
Santa Maria, CA 93455

Romspen Mortgage Ltd. Partnership
Attn: Wesley Roitman
162 Cumberland Street, Suite 300
Toronto ON M5R 3N5 Canada

Romspen Mortgage Ltd. Partnership
c/o Trevor A. Jenkins
Bryan Cave Leighton Paisner LLP
1200 Main Street, Suite 3800
Kansas City, MO 64105-2122

Romspen Mortgage Ltd. Partnership
c/o Lorna Miller
Bryan Cave Leighton Paisner LLP
3161 Michelson Drive, Suite 1500
Irvine, CA 92612-4414

Stantec
Attn: Dennis Lammers
13980 Collections Center Dr.
Chicago, IL 60693

TW Land Planning & Development, LLC
Attn:  Troy White
195 S. Broadway Street, Suite 209
Santa Maria, CA 93455

Brian D Fittipaldi
United States Department of Justice/OUST
1415 State Street, Suite 148
Santa Barbara, CA 93101